**PRIDEMARK, INC.** (formerly, Prefab Homes and Suppliers, Inc.,), Pridemark, Inc. of Connecticut, Eugene Blitz and Eleanor Blitz, Jules E. Blitz and Barbara J. Blitz, and Gershan K. Thiman and Joan G. Thiman, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

**No. 9707.**

United States Court of Appeals Fourth Circuit.

Argued Feb. 5, 1965.

Decided April 23, 1965.

Jack C. Merriman, Baltimore, Md. (Howard B. Miller and Weinberg & Green, Baltimore, Md., on brief), for petitioners.

Karl Schmeidler, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, on brief), for respondent.

Before SOBELOFF, BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Circuit Judge:

This petition for review principally challenges the determination of the Tax Court[1] sustaining the Commissioner's application of the "reincorporation" doctrine, and his denial of an exemption from taxation to proceeds from the sale of certain sales contracts by liquidating corporations. The facts are fully set forth in Judge Pierce's opinion and we shall here state only those we deem essential.

Pridemark, Inc., one of the petitioners in this case, was incorporated in 1946 under the laws of Maryland, with a paid-in capital of $6,000 represented by 5,000 shares of common stock. From that date until February, 1958, Pridemark was the exclusive dealer for prefabricated homes designed and manufactured by Golden Key Homes, Inc.

In 1950, Eugene Blitz, another petitioner, became president and sole shareholder of Pridemark. A new contract was signed with Golden Key whereby Pridemark was granted the exclusive right to sell Golden Key homes. Pridemark, in turn, was required to submit all contracts to Golden Key for approval and to purchase prefabricated homes solely from that manufacturer.

The second corporate petitioner, Pridemark, Inc. of Connecticut, was formed in 1952 by Eugene Blitz with a capital investment of $5,000 to act as Pridemark's selling agent in Connecticut. The two selling corporations maintained their principal offices at the same Baltimore location and were managed by the same personnel. They will be treated as one corporation for the purposes of this opinion.

The gross receipts of these petitioner corporations reached a peak of $3,178,042 in the fiscal year in 1956, then declined until gross receipts were only $1,791,266 in 1958. Less than $6,000 in total dividends was paid out during the 12 years of the corporation's existence preceding the year of liquidation.

As sales decreased the relationship between the petitioners and their supplier, Golden Key, steadily worsened. Controversies arose concerning the resale price at which the homes were to be sold and the emphasis to be placed in Pridemark's advertising campaigns on the respective trade names of the manufacturer and the dealer corporations. Several meetings were held during 1956 and 1957 to resolve these differences. In one of these conferences Eugene Blitz stated that he thought Pridemark would "do better" if it obtained another supplier. Finally, during a particularly heated discussion in the middle of 1957, Eugene Blitz suggested that the dealership be terminated so that another supplier could be obtained.

After several offers and counteroffers it was agreed that Golden Key would select and purchase those assets owned by Pridemark which the manufacturer thought valuable. Golden Key would then proceed to carry on its own selling operations. By an agreement dated February 3, 1958, Golden Key contracted to purchase all of Pridemark's customer contracts on which no deliveries had been made, leases on branch offices, customer lists and good will. Pridemark retained its Baltimore office and its corporate name because Golden Key did not think them worth purchasing. The purchase price was $174,866, $134,400 of which represented uncompleted contracts.

Before the sale, in January, 1958, the Board of Directors of Pridemark voted to dissolve the corporation. Eugene Blitz then held all the common stock as trustee

1. 42 T.C. 510 (1964).

for a voting trust of which he was an 80% beneficial owner. He also held all of the Class B preferred, with a par value of $100,000. Various employees held the Class A preferred, having a par value of $8,600. The A preferred was redeemed in July, 1958, and is not in issue here.

During the last half of 1958 approximately $108,000 was distributed to beneficiaries of the voting trust. The B preferred, held solely by Eugene Blitz, was redeemed in January, 1959, for $127,-167, and the remaining assets, mostly uncollected accounts receivable, were conveyed directly to the five voting trust beneficiaries. They in turn reconveyed them to Eugene Blitz as trustee to dispose of as he saw fit. There was no testimony that the stockholders were under any legal or moral compulsion to reconvey their assets to Blitz. The only evidence indicates that this was done in order to enable him to collect the debts owed Pridemark.

Pridemark, Inc. of Connecticut, the common stock of which Eugene Blitz owned approximately 74%, was liquidated in the same manner. Articles of dissolution for the two corporations were filed in Maryland and Connecticut.

I

If, when the individual petitioners dissolved Pridemark, they had permanently abandoned the selling of prefabricated homes it would have been clear that there had been a "complete liquidation" within the meaning of sections 331 and 337.[2] The distributions to the shareholders would then be treated as a redemption of stock rather than a dividend, and sales of capital assets by the liquidating cor-

poration would be tax exempt. The shareholders of Pridemark, the old corporation, decided, however, in November, 1958, to form a new corporation to be called Pridemark Enterprises, Inc. This corporation eventually signed a dealership contract with Hilco Homes, Inc., and began to sell prefabricated homes in the spring of 1959. The formation of this new corporation, several months before the final dissolution of the old, prompted the Commissioner to invoke the "reincorporation" doctrine, thereby denying the tax exempt status of the corporate sales during the year of liquidation and taxing the distributions to the shareholders as dividends. This approach, adopted by the Tax Court, is the subject of the present appeal.

Before considering the intricacies of the "reincorporation" doctrine it is necessary to elaborate upon the circumstances surrounding the death of the old corporation and the birth of the new. The motivation of Eugene Blitz, the controlling shareholder of both corporations, in liquidating Pridemark is of particular relevance. As we have seen, in late 1957 he expressed a desire to terminate business relations with Golden Key but still hoped to become agent for another manufacturer. Efforts made at that time to find a suitable substitute for Golden Key were to no avail. Decreasing sales and his own advancing age prompted Eugene Blitz to get out of the prefabricated home business and to plan investing in some new business to be conducted by his son. Consequently, Pridemark sold all of its branch offices and customer lists to Golden Key in February, 1958. As part of the transaction Golden Key was allowed to hire away

2. Int.Rev.Code of 1954, § 331:
  "(a) General rule.—
    "(1) Complete liquidations.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock."
  Int.Rev.Code of 1954, § 337:
    "(a) General rule.—If—
    "(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

    "(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."

any of Pridemark's personnel that it desired, Pridemark and its owners promising not to rehire any of these employees until a year had passed. As a result Pridemark lost its entire sales force, some of whose members had been with the organization as long as 12 years. The sales manager left to supervise Golden Key's selling activities. The business built up by Eugene Blitz was thereafter carried on by Golden Key without interruption.

The old corporation engaged in no active selling for the remainder of its corporate life. The inactivity continued from February, 1958, to the corporation's dissolution in February, 1959. During this period funds distributed to the shareholders were invested in companies manufacturing kitchen cabinets and "three-wheeled vehicles," and in several land development ventures. When these investments proved disappointing, the Blitzes, father and son, and the petitioners associated with them in the old corporation began to weigh the advisability of returning to the business they knew best, the retailing of prefabricated homes.

In October or November, 1958, a representative of Hilco Homes, Inc., a manufacturer of prefabricated homes, came to the head office of the old corporation on business unrelated to this case. In the course of his visit the possibility of Blitz representing Hilco was discussed. There is no indication in the record as to who broached this topic of conversation, but it was agreed that the subject should be explored at greater length at some future date. Negotiations followed in December, 1958, and finally, on February 9, 1959, a dealership arrangement was entered into between Hilco and Pridemark Enterprises, the new corporation.

In the meantime, the articles of the new corporation were executed on November 26, 1958, and it was incorporated under the laws of Maryland on January 2, 1959. Eugene Blitz, as trustee of the old corporate assets conveyed to him by the shareholders, transferred the lease on the Baltimore office and the right to use the name "Pridemark" to the new corporation. Both of these assets had been rejected by Golden Key the preceding year. During 1959, Eugene Blitz, still acting as trustee, contributed $39,000 in nine installments to the new corporation. Gershan Thiman, a petitioner here and an accountant for the old corporation, was made president of the new. Jules Blitz, son of Eugene, became treasurer in the new corporation as he had been in the old. Eugene Blitz, who had been president of the old corporation, was named secretary and Samuel Hoffman, an office worker in the old concern, vice-president. At various times after a year had passed from the sale to Golden Key four of the ten salesmen returned to work for the new corporation. The first returned in May, 1959, the last in February, 1962.

Eugene Blitz, owner of 80% of the old corporation's common stock, took a 61% interest in the new, and he signed stock options which, if exercised, would reduce his holdings to 44%. He associated with the new corporation in a purely advisory capacity, receiving no salary during the first two years of operation.

The remaining owners of the new corporation were Jules Blitz, Thiman, and McCaffrey (a salesman) who subscribed for 10% of the stock in the new company, compared to 5% in the old; and Perron and Hoffman, who had no common stock in the old company but took 5% and 4%, respectively, in the new.

Since the early years of the Internal Revenue Code taxpayers have devised many schemes in the hope of withdrawing corporate profits at capital gains rates without interrupting corporate business. The most obvious of these devices is that made possible by the liquidation provision of the Code, section 331 (a) (1), which provides that:

"Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock."

Taxpayers soon attempted to attain the desired advantage by liquidating their corporations, distributing the assets to themselves as shareholders, then reconveying them to a new corporation in return for its stock. All this could be done in a lawyer's office without interruption of the corporation's business.

The Treasury chose to attack flagrant distortions of the underlying purpose of section 331 by describing such a transaction as a reorganization and treating the cash distributions as "boot" taxable at ordinary income rates. Int.Rev.Code of 1954, § 356(a). An apt description of the above type of transaction was found in section 112(g) (1) (C) of the 1934 Code, now known as a "D" reorganization. That section described as a reorganization:

"[A] transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred."

The section was interpreted to include transfers through the shareholders, by way of liquidation, to the transferee corporation as well as transfers directly from the old corporation to the new.

The effectiveness of the "D" reorganization section of the Code in attacking "reincorporations" was considerably diminished by the Revenue Act of 1954 which, *inter alia*, added the requirement that there be a transfer of *substantially all* of the old corporation's assets to the new. Sections 368(a) (1) (D), 354(b) (1) (A).[3] To understand the effect of this amendment it must be remembered that the reorganization section of the Code was originally adopted to protect against taxation on corporate transactions where no economic gain is actually realized. See Paul, Studies in Federal Taxation, Third Series (1940). The 1954 amendment was intended to withdraw beneficial reorganization treatment from transactions which Congress felt involved true economic gain. Its unintended result was to blunt an instrument highly useful in attacking "reincorporations."

The first effort designed to deal explicitly with the "reincorporation" problem was passed by the House in 1954,[4] but rejected by the Senate. The Senate-House Conference Committee, also rejecting it, commented as follows:

3. The "D" reorganization is now described in Int.Rev.Code of 1954, § 368(a) (1) (D), as:

"[A] transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355 or 356." Int.Rev.Code of 1954, § 354:

"(a) General rule.—

"(1) In general.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

⁂      *      *      *      *

"(b) Exception.—

"(1) In general.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless—

"(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; * * ⁂."

4. H.R. 8300 provided that if the transaction has tax avoidance as a principal purpose, and if the new corporation is formed within five years of liquidation of the old corporation, the transfer of more than 50% of the assets of the old corporation (exclusive of money and securities) to a new corporation in which shareholders of the old held at least 50% of the stock would result, among other things, in the taxability of the non-reincorporated assets to the shareholders as a dividend.

"Liquidation followed by reincorporation.—The House bill in section 357 contained a provision dealing with a device whereby it has been attempted to withdraw corporate earnings at capital gains rates by distributing all the assets of a corporation in complete liquidation and promptly reincorporating the business assets. This provision gave rise to certain technical problems and it has not been retained in the bill as recommended by the accompanying conference report. It is the belief of the managers in the part of the House that, at the present time, the possibility of tax avoidance in this area is not sufficiently serious to require a special statutory provision. *It is believed that this possibility can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill.*" H. Conference Rep. No. 2543, 83d Cong.2d Sess., p. 41 (3 U.S.C. Cong. & Adm. News (1954), pp. 5280, 5301). (Emphasis added.)

Just what force should be given to the italicized passage is unclear. Courts resort to congressional history for an explanation of changes incorporated in legislation. While a conference report cannot be used to make new law,[5] it is clear here that the committee was aware of the problem and thought the present statutory scheme adequate to deal with it. We agree with the conferees' reading of the Code but hold that the facts of this case do not bring it within the "reincorporation" area because the transactions were not motivated by a desire to avoid the payment of taxes. The Commissioner attacks the transactions in two ways. First, he contends that there was no "complete liquidation" because the shareholders began selling prefabricated homes again through a new corporation before the old one was finally liquidated. Second, it is the Commissioner's position that the transactions, taken as a whole, constitute an "F" reorganization.[6]

The Code provides no definition of "complete liquidation." We reject the simplistic argument of the taxpayer that the phrase refers only to the measures required by state law to terminate a corporation's legal existence. No reason is offered as to why the observance of such mechanical procedures would prompt Congress to treat as stock redemptions payments that are in reality dividends. A more convincing indication of what distributions are meant to be accorded favored treatment is found in an early report of the Senate Finance Committee. S.Rep. No. 398, 68th Cong., 1st Sess. 12 (1924). There a distribution in complete liquidation was analogized to a sale of stock in that the shareholder "surrenders his interest in the corporation and receives money in place thereof." The corporation must have ceased to be a going corporate concern, or if the enterprise is continued in corporate form, the shareholder must have disassociated himself from it. See Regs. 1.-332–2(c) (1955). If the liquidated business is not resumed by the new corporation as a continuation of a going concern, there is a "complete liquidation." This is what happened in the present case.

For over one year the principals stopped selling prefabricated homes.[7] Every asset owned by the old corporation

---

5. See Nicholson, "Recent Developments in the Reincorporation Area," 19 Tax L.Rev. 123, 131 (1964). But when the reason given for not changing is that the evil adverted to can be dealt with adequately under existing law, this may be considered by the courts in interpreting a doubtful provision of existing law.

6. Int.Rev.Code of 1954, § 368(a) (1) (F) defines a reorganization as "a mere change in identity, form, or place of organization, however effected."

7. Contrast the typical "reincorporation" case where there is no interruption in the business, the liquidation amounting to no more than a paper transaction. See Lewis v. Commissioner of Internal Revenue, 176 F.2d 646 (1st Cir. 1949); Survaunt v. Commissioner of Internal Revenue, 162 F.2d 753 (8th Cir. 1947).

was offered to Golden Key. The salesmen, sales lists and sales offices, an organization built up over a 12-year period, were all transferred as a going business. Such a complete divestiture is not compatible with a purpose to revive the business at a later date. The new corporation cannot fairly be considered a continuation of the old business when in fact it has been continued, without interruption, by Golden Key.

The gross receipts of the old corporation in its last year of operation were $1,791,266. In its first year of operation the new corporation grossed less than $300,000, indicating plainly enough that a new business was being built up. Eugene Blitz, the president and controlling force of the old corporation, now acts in an advisory capacity only to the new. The assets transferred to the new corporation were a negligible proportion of the assets held by the old and much of the good will was in the name of Golden Key Homes rather than Pridemark. These facts compel a conclusion that there was, in fact, a complete liquidation of Pridemark.

■■ The second approach pressed by the Commissioner, that of the "F" reorganization, is limited in scope. That section refers to "a mere change in identity, form, or place of organization, however effected." Int.Rev.Code of 1954, § 368(a) (1) (F). The section, though aged, has received almost no administrative or judicial attention until recently.[8] Its application is limited to cases where the corporate enterprise continues uninterrupted, except perhaps for a distribution of some of its liquid assets. There is a mere change of corporate vehicles, the transferee being no more than the alter ego of the transferor. See Lane, "The Reincorporation Game: Have the

Ground Rules Really Changed?," 77 Harv.L.Rev. 1218, 1247 (1964). Such was not the case here.

Since there is a complete liquidation of Pridemark, Inc., and Pridemark, Inc. of Connecticut, within the meaning of sections 331 and 337, the distributions to the shareholders are entitled to be treated as a redemption of stock and taxed as a capital gain.

### II

Among the assets sold by the old corporation to Golden Key on February 3, 1958, were all of Pridemark's sales contracts upon which no deliveries had been made. There were 1,108 such contracts, 258 of which were described as "active" because it was anticipated that a substantial portion of them would be consummated by the final delivery of a house. A purchase price of $134,400 was agreed on by estimating the number of contracts in this active group that would result in final delivery (91) and multiplying it by the average purchase price of each house ($6,000). The agreed purchase price was 20% of this figure. The computation produced a figure of $109,200, to which was added $25,200 representing the possibility that eventually some of the remaining contracts might also be consummated. A total of $23,624 in deposits had been made by the customers in connection with these contracts.

Although the petitioners kept their books on an accrual basis they had not accrued, at any time prior to the sale, any amount with respect to these 1,108 uncompleted contracts. The taxpayers' position is that these contracts are "property" with the result that their sale during the year of complete liquidation is tax exempt under the terms of section 337(b).[9] The Commissioner, on the oth-

---

8. See Rev.Rul. 57-276, 1957-1 Cum.Bull. 126; Rev.Rul. 58-422, 1958-2 Cum.Bull. 145-146.

9. Int.Rev.Code of 1954, § 337(b):
   "(b) Property defined.—
   "(1) In general.—For purposes of subsection (a), the term 'property' does not include—

"(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

er hand, contends that these uncompleted contracts are not "property," as that term is used in section 337, because they represent ordinary income earned by the performance of services. Before determining whether the gain should be recognized it is necessary to decide the nature of the gain that the Commissioner seeks to tax and the taxpayers seek to exempt.

The contracts were the product of Pridemark's sales activities carried on through its salesmen, sales offices, catalogues and other advertising. The contracts provided that neither Pridemark nor the customer was obligated to go through with the sale until the customer had met all of the following conditions: (1) obtain sufficient financing; (2) arrange for a contractor to erect the house; (3) secure a clear title to the building site; (4) arrange for compliance with local building and zoning ordinances. There was no duty on Pridemark's part to assist customers in fulfilling the contractual conditions, but the salesmen, to insure their eventual receipt of commissions, did give such assistance.

On the signing of a contract a deposit was required, varying in amount up to $500. This sum would later be applied against the cost of the house if a delivery was finally made. If no delivery was made the deposit would be forfeited to Pridemark or voluntarily returned depending on the particular circumstances.

Pridemark would accrue income from the contracts only when deliveries were begun. The Tax Court, on the other hand, held that the sale of the contracts constituted an anticipatory assignment of income and that the gain was therefore taxable as ordinary income.

Taxpayers insist that the contracts sold to Golden Key contained no "element of income," that they were mere "sales orders" which entitled Pridemark to no income until "all the services had been completed." We find this position untenable. When the contracts were signed and the deposits made the dealer corporation had entered into arrangements giving rise to ordinary income in a predictable number of instances. If customer payments gave rise to income as received, it follows that the consideration paid by Golden Key for the assignments should likewise be treated as ordinary income. Pridemark cannot be allowed to avoid such treatment by assigning the contracts before completion. The fact that arguably there were services still to be performed was relevant in determining the price Golden Key was willing to pay for the assignment, but it has no relevance to the present discussion.[10]

Recent decisions have adopted two entirely compatible explanations in support of taxing as ordinary income amounts received in payment for the assignment

---

"(B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a)) of stock in trade or other property described in subparagraph (A) of this paragraph, and

"(C) installment obligations acquired in respect of property (other than property described in subparagraph (A)) sold or exchanged before the date of the adoption of such plan of liquidation.

"(2) Nonrecognition with respect to inventory in certain cases.—Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is at-

tributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term 'property' includes—

"(A) such property so sold or exchanged, and

"(B) installment obligations acquired in respect of such sale or exchange."

10. "[T]he fact that the taxpayers would have to spend their time and energies in performing services for which the compensation would be received merely affects the price at which they would be willing to assign or transfer the contract." United States v. Eidson, 310 F. 2d 111, 115 (5th Cir. 1962).

of items similar to these contracts. Some courts have ruled that the right to earn ordinary income is not "property" for capital gain purposes under section 1221.[11] Others have described the consideration so received as a lump sum substitute for future ordinary income.[12] The two approaches reach essentially the same conclusion—that it was not the purpose of Congress to permit taxpayers to convert ordinary income into a capital gain by assigning the right to receive it to a third party.

The money paid to Pridemark represents the value of its efforts in securing the customer's signature on a contract and getting a deposit made on that contract. This was the dealer corporation's principal activity. While in some situations a distinction might be made between a legally enforceable right to earn future income and a mere expectancy that work done in the past may lead to such a right, that distinction may not be made here. The latter expectancy has been described as good will and taxed as a capital asset. Those cases are well summarized by the definition in Boe v. Commissioner of Internal Revenue, 307 F.2d 339, 343 (9th Cir. 1962), that "the essence of good will is the expectancy of continued patronage." In that case the taxpayers had contracted to be available to perform medical services as the need arose. These arrangements, it was hoped, would lead to contracts at some unspecified time in the future. Such was not the case here. The contracts sold to Golden Key were valuable, not for any hope for remote earning opportunity but for immediate or impending bene-fits. Golden Key was compensating Pridemark for its successful sales activities that had produced fruit ready to be picked.

■■ As the capital gain provisions are an exception to the ordinary treatment accorded most income, they must be strictly construed. A capital gain represents an appreciation in value accruing over a prescribed period of time on the investment of money in property. The statutory sections dealing with such property are designed to lessen the hardship of taxing the appreciation in value of such property in any one tax year.[13] It is clear that the contracts in question do not fall within this exception. They represent services rendered in obtaining the contracts rather than an enhancement of an income producing asset.

The taxpayer contends, however, that even if the sale price of the uncompleted contracts is an ordinary income item, it is nevertheless exempted from taxation by the provisions of section 337. That section exempts from taxation gains arising from the sale of "property" during the year of liquidation. The parties to the appeal offer contrasting definitions of "property." The taxpayers insist that the term embraces any asset other than those explicitly excluded. To this the Commissioner answers that it has the same meaning as when used in defining "capital asset" under section 1221. The Tax Court found it unnecessary to reach this issue, having decided that there was not complete liquidation.

■ Section 337 was embodied in the Internal Revenue Code of 1954 to

---

11. Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, 80 S. Ct. 1497, 4 L.Ed.2d 1617 (1960); Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2d Cir. 1962); Miller v. Commissioner of Internal Revenue, 299 F.2d 706 (2d Cir.), cert. denied, 370 U.S. 923, 82 S.Ct. 1564, 8 L.Ed.2d 503 (1962).

Int.Rev.Code of 1954, § 1221. "Capital asset defined.

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer * * *."

12. See Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958).

13. See United States v. Woolsey, 326 F. 2d 287, 290 (5th Cir. 1964); Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, 134, 80 S.Ct. 1497 (1960); Corn Products Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955); Hort v. Commissioner of Internal Revenue, 313 U.S. 28. 61 S.Ct. 757, 85 L. Ed. 1168 (1941).

allow liquidating corporations to avoid a double incidence of capital gains taxation—once when capital assets are sold by the corporation, and again on distribution of the proceeds to the shareholders. Congress, however, clearly indicated that it did not intend section 337 to be used as a device to avoid taxation on income generated by the normal operations of a business.[14] The taxpayers offer no explanation as to why Congress would wish to tax such income if received by the liquidating corporation directly from the customers but exempt it if it is received indirectly through a third party as consideration for an assignment before collection.

 The heart of the definition of "property" in section 337 was taken almost verbatim from the definition of capital assets referred to above, now found in section 1221. Both sections are designed to give preferential tax treatment to sales of certain types of assets not held for sale in the ordinary course of business.[15] We interpret them as having the same meaning.

Thus, section 337 exempts the sale of capital assets only during the year of liquidation. The uncompleted sales contracts not being capital assets, the proceeds received for their assignment are to be taxed as ordinary income.

### III

The remaining issues may be disposed of without extensive discussion.

For the reasons stated by the Tax Court we affirm its holding that deposits made on the "inactive" contracts must be included in Pridemark's income for the year in which those contracts were sold to Golden Key rather than in the year of final liquidation.

We reverse the Tax Court's decision that legal fees incurred in connection with the sale of assets to Golden Key are to be deducted from the gain realized on that sale. Its decision was predicated on the determination that there was no complete liquidation. Having found a liquidation, we approve Pridemark's deduction of these fees as ordinary and necessary business expenses incurred in liquidation. Pacific Coast Biscuit Co., 32 B.T.A. 39, 42 (1935); see Note, "Certain Tax Aspects of Organization, Reorganization, and Liquidation Costs," 10 Stan.L.Rev. 112, 118–19 (1957).

Finally, the Tax Court disallowed a deduction to Pridemark for the $30,000 paid to Eugene Blitz in 1959 as deferred compensation because, in part at least, the taxpayers had failed to sustain their burden of showing that the amount of compensation was reasonable. We affirm the disallowance on this ground. The Tax Court's resolution of this factual issue was in no sense arbitrary.

Affirmed in part and reversed in part.

14. "It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating." S.Rep. No. 1622, 83d Cong., 2d Sess.

259 (1954), U.S.Code Congressional and Administrative News 1954, p. 4897.

15. See Note, "Tax Free Sales in Liquidation Under Section 337," 76 Harv.L.Rev. 780, 793 (1963).