363 F.2d 262
 66-2 USTC P 9498
 John G. MOFFATT, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Mary E. MOFFATT, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
John G. MOFFATT and Mary E. Moffatt, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Frank E. NICHOL, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Ruth H. NICHOL, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Frank E. NICHOL and Ruth H. Nichol, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
George C. MURRAY and Anna Mae Murray, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 19674-19680.
 United States Court of Appeals Ninth Circuit.
 May 31, 1966, Rehearing Denied Aug. 29, 1966.
 
 Joseph D. Peeler, Gerald G. Kelly, Peter C. Bradford, Musick, Peeler & Garrett, Los Angeles, Cal., Numa L. Smith, Jr., Miller & Chevalier, Washington, D.C., for petitioners.
 Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Javid O. Walter, Herbert Grossman, John Jones, Attys., Dept. of Justice, Washington, D.C., for respondent.
 Before BARNES and KOELSCH, Circuit Judges, and CRAIG, District Judge.
 BARNES, Circuit Judge:
 
 
 1
 These consolidated cases appear before us on a petition to review decisions of the Tax Court. (42 T.C. 558 (1964).) The Tax Court upheld the Commissioner's assessment of deficiencies in taxpayers' federal income tax returns for the taxable years 1958 and 1959. Our jurisdiction to entertain this petition is conferred by Sections 7482 and 7483 of the Internal Revenue Code of 1954.
 
 
 2
 One basic question involving the corporate tax provisions of the Internal Revenue Code of 1954 is presented for our consideration. We must determine whether distributions by the corporation, Moffatt & Nichol, Inc., to its shareholders (petitioners) were liquidating distributions under Sections 331(a) (2) and 346, and therefore taxable as capital gains, or were distributions incident to a plan of reorganization under Sections 354 and 368, and therefore taxable as dividends under Section 356. Taxpayers challenge the decision of the Tax Court on the grounds (1) that the steps taken to liquidate Moffatt & Nichol, Inc. were not part of an integrated plan of reorganization, and (2) that the steps taken, even if viewed as interrelated, did not satisfy the statutory reorganization requirements of Sections 354 and 368.
 
 
 3
 From the date of its incorporation in 1947 until approximately October 1957, Moffatt & Nichol, Inc. was primarily engaged in consulting engineering. Its principal place of business was located in Long Beach, California. During those years the company's stock was owned by taxpayers John G. Moffatt (45%), Frank E. Nichol (45%) and George G. Murray (10%). In addition to its principal activity, the company (hereinafter sometimes referred to as 'Inc.') also participated in various joint ventures and was licensed as a building contractor, although it did not actually engage in any building activities. Although the shareholders were Inc.'s key employees, more than sixty other people were employed, about one-third of whom were considered of professional standing. The company prospered greatly during this decade, and though its taxable income declined in 1957 from the preceding year's figure, the 1957 income had still more than quadrupled the 1953 figure. Despite its prosperity, however, only one dividend ($30,000 in 1955) had been paid from the company's inception.
 
 
 4
 On April 12, 1957, Henry E. Howard, a certified public accountant, was engaged by Inc. to review the company's tax problems. Howard attended a conference with Inc.'s counsel on April 30, 1957, and afterwards prepared a memorandum concerning those tax matters discussed. This memorandum read in part as follows:
 
 
 5
 'May 6, 1957
 
 Introductory Statement
 
 6
 At the conference held in your office Tuesday last, certain proposals were discussed relating to the tax problems of the above corporation and its principal stockholders. Several tentative solutions were set forth. Briefly: (1) Liquidation of the corporation. (2) Sale by principal shareholders of a portion of their holdings. (3) Purchase of real estate by stockholders and subsequent sales. (4) Tax planning for existing corporation. * * * (6) Problems of principal stockholders relating to bad debt loss resulting in capital loss carryovers.
 
 
 7
 * Liquidation of Corporation.
 
 
 8
 While we appreciate that this would provide the principal stockholders with the sought-after capital gains, it would present other problems which could very well offset the advantages obtained. The principal disadvantage would be the amount of taxes required to be paid in the year of liquidation. This corporation is reporting profits on a hybrid-accrual method. If this method is adhered to consistently it is doubtful that a change will be made by the commissioner (I.R.C. 446(c)), however if the corporation ceases operations and liquidates it is probable that all earned income both recorded and unrecorded will immediately become subject to corporate tax rates and also be subject to liquidating dividends. (Rev.Rul. 1953-255).
 
 
 9
 An alternative may be found in the delaying of liquidation with a transfer of operations. Under this plan the existing corporation would remain in existence for a period of time, its only activity being completion of present projects and collection of outstanding accounts. This would be accompanied by the formation of a new organization to take on new contracts. The effect would be to defer the payment of the taxes mentioned before and also to cover the possibility of additional nonbusiness bad debts in the hands of the individuals which may occur in future years. This plan of course would require a division of labor and other costs with the resulting increase of time and cost in record keeping. The period for which liquidation could be delayed would be determined by application of section 531, which would probably be about one year after the plan became effective.'
 
 
 10
 This possible approach to the tax problems of Inc. and its key employees reflected the fact that Moffatt and Nichol had each suffered substantial nonbusiness bad debt losses in 1954, 1956 and 1957, and both anticipated future bad debt losses on outstanding loans to one Powers. The above proposal sought primarily to provide ample capital gains against which the capital losses could be offset.
 
 
 11
 In substance, the above plan of Howard was adpoted by Inc.'s management. A new entity, Moffatt & Nichol, Engineers (hereinafter referred to as Engineers), was incorporated on July 22, 1957, with the same principal place of business as Inc. On October 10, 1957, the stock was authorized to be issued to Moffatt (40%), Nichol (40%), Murray (10%), and 10% To Bobisch, a structural engineer, who for some time had been negotiating to purchase a proprietary interest in the consulting engineering operation. When Bobisch, on March 7, 1958, terminated his employment with Engineers, his ten per cent was bought by and distributed equally to Moffatt and Nichol, giving each the identical share that he possessed in the ownership of Inc. Engineers' stock was not actually issued until September 2, 1958.
 
 
 12
 Moffatt, Nichol and Murray obtained loans in the aggregate amount of $22,500 from Inc. on their notes, in order to pay for their Engineers stock. Payment for the stock was made on October 1, 1957, by having Inc. issue its check for $22,500 to Engineers. The obligations of Moffatt, Nichol and Murray on their notes were discharged on December 23, 1957, through deductions from their salaries by Engineers which were applied for that purpose.
 
 
 13
 As a consequence of Engineers formation as of October 1, 1957, all employees of Inc., including all officers, were transferred to the books of Engineers. Inc.'s pending contracts were not assigned to Engineers, but the work in process was delegated to the new company which in turn was duly compensated for its efforts. Engineers operated in the same physical premises that Inc. had used since its inception. It also used the same equipment which, for accounting purposes, it leased from Inc. at the depreciation rate plus ten per cent. All new contracts entered into after October 1, 1957, were undertaken in Engineers' name.
 
 
 14
 The findings of the Tax Court, supported by the evidence in the record, summarize the effects of this transformation:
 
 
 15
 'Subsequent to October 1, 1957, Moffatt and Nichol, Inc. had no paid employees, no equipment, and no facilities for conducting an engineering business. Moffatt and Nichol, Inc. had made available to Engineers all of the equipment and facilities necessary to carry on the engineering business it had previously conducted. Its assets consisted, in addition, of cash and liquid items (including accounts receivable), land and building plans relating to such land. Cash necessary for the operation of the consulting engineering business was made available to Engineers by means of loans, and accounts receivable were ultimately transferred to Engineers, all as hereinafter set forth. The land, hereinafter described, had never in fact been used in the business.
 
 
 16
 'Moffatt and Nichol, Inc. had to remain in existence after October 1, 1957, in order to 'phase out' outstanding Government contracts in its hands at that time. These contracts were nonassignable. The primary activity of Moffatt and Nichol, Inc., subsequent to the October 1957 transfer, was the collection of accounts in respect of contracts in its name for which work had been done by it (prior to the transfer) and by Engineers (subsequent to the transfer).' (Tr. 169-70.)
 
 
 17
 Subsequent to the transfer of the engineering operations to Engineers, Loans in the amount of $89,000 were made to Engineers by Inc. Finally, on December 23, 1958, Inc.'s board of directors drafted a formal resolution to wind up its company's affairs. In this regard, Inc. distributed to its shareholders promissory notes, cash, automobiles, office furniture, and other equipment. On January 2, 1960, Engineers purchased the notes and the equipment (with the single exception of one automobile) from the taxpayers. Much of the cash was also transferred by the stockholders to Engineers in exchange for notes.
 
 
 18
 As a result of this series of transactions, Moffatt and Nichol each reported long-term capital gain in respect of liquidating dividends of Inc. totaling $88,162.89 for the taxable years 1958 and 1959. Substantial capital losses were offset by each taxpayer against these reported gains. The Tax Court, however, held that the distributions in liquidation by Inc. were 'boot' incident to a corporate reorganization (368(a)(1)(D)), and as such were taxable as ordinary income under Section 356 of the Internal Revenue Code of 1954.
 
 
 19
 From the above statement of facts, as found by the Tax Court, we find the Tax Court correct in its conclusion that the individual steps taken, beginning with the formation of Engineers, were interrelated parts of an integrated plan of reorganization. The proposal contained in the Howard memorandum, adopted with only minor deviation, unquestionably sought to continue the corporate operations, while siphoning off substantial earnings at capital gains rates. The net effect of the steps taken was merely to change the name of the corporation. Inc. remained in existence, for all practical purposes, for the sole purpose of collecting the amounts due on pending contracts which were delegated to Engineers for completion. The evidence thus clearly supports the finding of one integrated transformation.
 
 
 20
 There remains for our consideration, however, the question of whether the interrelated steps described above constitute a plan of reorganization within the purview of Section 368 of the Internal Revenue Code. It was the determination of the Tax Court that this integrated plan qualified as a reorganization under subsection 'D' of Section 368. This provision reads as follows:
 
 
 21
 'SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
 
 
 22
 (a) Reorganization.--
 
 
 23
 (1) In general.-- For purposes of parts I and II and this part, the term 'reorganization's means--
 
 
 24
 (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356 * * *.'
 
 
 25
 Section 368(a)(1)(D), as a prerequisite to its own operation, requires qualification under an additional statutory provision. In this case, the relevant provision is Section 354, which reads in pertinent part as follows:
 
 
 26
 'SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.
 
 
 27
 (a) General Rule.--
 
 
 28
 (1) In general.-- No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
 
 
 29
 (b) Exception.--
 
 
 30
 (1) In general.-- Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless--
 
 
 31
 (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and
 
 
 32
 (B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.'
 
 
 33
 The findings alluded to above clearly disclose that the transactions in question were pursuant to an integrated plan and did involve an exchange of stock for stock. This leaves as the only Section 354 requirement that must be met for the transaction to qualify as a type 'D' reorganization under Section 368 that the new corporation acquired 'substantially all' of the assets of the old corporation.
 
 
 34
 The taxpayers in the present case strenuously contend that not substantially all of Inc.'s assets were transferred to Engineers, and a 368(a)(1)(D) reorganization therefore did not occur. The taxpayers rely primarily on the fact that a large portion of the book assets of Inc. (35.48%) was in the form of land investment and building plans (held for a proposed building construction) which never came into the ownership of Engineers. We find substance to taxpayers' contention when we apply a straight percentage of book assets test to determine what constitutes 'substantially all.' Commissioner v. First Nat. Bank, 104 F.2d 865 (3d Cir. 1939), is frequently cited for the proposition that 86 per cent total net worth is 'substantially all.' Arctic Ice Machine Co. v. Commissioner, 23 B.T.A. 1223 (1931), similarly is cited for the proposition that 68 per cent is insufficient.
 
 
 35
 We are of the opinion, however, that a sounder view is espoused by Rev.Rul. 57-518, 1957-2 C.B. 253, to the effect that no particular or specific percentage should be controlling.[1] Rather, the ruling advises that 'the nature of the properties retained by the transferor, the purpose of retention, and the amount thereof' are all to be considered. In the present case the Tax Court made the following finding which we deem dispositive of taxpayers' contention when viewed in the light of the more flexible rule:
 
 
 36
 'In one form or another the new company had the use and benefit of all the assets relating to the operation of the business, whether by 'loans', 'rentals' of equipment followed ultimately by sale thereof, or otherwise. And it finally would up with all the assets that were necessary or appropriate to the conduct of the business. There remained in the hands of the stockholders only certain nonoperating assets that were not required in the business, and even these assets (as resources) were 'pledged' (Tr. 171; Ex. PP) by Moffatt and Nichol, Inc. to the new corporation.' (Tr. 197-98.)
 
 
 37
 In the setting of a service organization such as a consulting engineering operation, the retention of physical nonoperating assets such as land should not cloud the fact that the essential tangible and intangible assets of one corporation have been transferred to another corporation.[2] That is what occurred here.
 
 
 38
 The skilled employees, the most essential asset of any service organization, were all transferred to Engineers. Similarly, almost the entire lot of operating assets was also transferred. We would ignore the real character and substance of a transaction to hold in this case, as the petitioners urge, that the retention of a substantial portion of the company's dollar assets, unnecessary and unused in the business, is sufficient to defeat the operation of Section 368(a)(1)(D) without making any further inquiry as to the nature of those retained assets and the purpose behind their retention.
 
 
 39
 In support of affirmance the Commissioner contends the same result is reached by application of 26 U.S.C. 368(a)(1)(F) which applies whenever there is a 'mere change in identity, form, or place of organization, however effected.'
 
 
 40
 Considering these additional factors, and dispensing with the solitary and technical percentage theory, we find, in accordance with the position taken by the Tax Court, that Inc. transferred substantially all of its assets to Engineers. We therefore find that the transactions in question did constitute a type 'D' reorganization.
 
 
 41
 The decisions of the Tax Court are affirmed.
 
 DISSENTING OPINION
 
 42
 CRAIG, District Judge.
 
 
 43
 The majority opinion well states the issues before this Court. Based upon the record in this case, I would disagree with the conclusion of the majority opinion that the steps taken to liquidate Moffatt and Nichol, Inc. constituted a part of an integrated plan of reorganization.[3]
 
 
 44
 The real issue in this case seems to me to be the interpretation of Section 354(b)(1)(A). Assuming, however, that the majority is correct in its conclusion that there was in fact an integrated plan of reorganization, the transaction in my opinion would still not qualify under the provisions of Section 368(a)(1)(D) because of the effect of Section 354, which is, as the majority opinion states, a prerequisite to the operation of Section 368(a)(1) (D). Section 354(b)(1)(A) requires that the corporation to which the assets are transferred acquire substantially all of the assets of the transferor of such assets before the transaction qualifies under Section 368, supra.
 
 
 45
 The total liquidation to the petitioner stockholders was $239,522.67, which may be itemized as follows:
 
 
 46
 (Fair market Value)
December 1958--Notes of the new corporation
 due to the old $ 40,000.00
December 1959--Money 60,000.00
December 1959--Automobiles and equipment 10,169.93
December 1959--Accounts Receivable 20,303.25
December 1959--Land and building plans 84,995.85
January 1960--Money 24,183.64
 -------------------
 $239,522.67
 
 
 47
 Of these amounts it is not seriously disputed that the land and building plans worth $84,995.85 have not been transferred to the new company, nor is it contested that the following definitely were transferred:
 
 
 48
 Notes of the new corporation
 due the old ................. $ 40,000.00
Automobiles and equipment ........ 9,772.33
Accounts receivable ............. 18,799.17
 -----------
 $ 68,571.50
 
 
 49
 The Commissioner contended that much of the cash was technically transferred to the new company, since the petitioners made some large loans to Engineers after receiving cash from Inc.'s liquidation.
 
 
 50
 The Commissioner first contends that 'substantially all of the assets' means 'substantially all of the operative assets'. I cannot agree. If Congress intended to limit the transfer to 'operative assets' it would have said so. Congress did not, and the Court should not read into the Code that which is not there. Pillar Rock Packing Company v. Commissioner, 9 Cir., 90 F.2d 949 (1937); C.T. Inv. Co. v. Commissioner, 88 F.2d 582 (1937).
 
 
 51
 Petitioners cite numerous cases which indicate that 'substantially all of the properties' under the 1939 Code was interpreted as meaning at least 80% If not more of the properties, including intangibles such as accounts receivable. Pillar Rock Packing Company v. Commissioner, supra; Western Industries Co. v. Helvering, 65 App.D.C. 205, 82 F.2d 461 (1936); Schuh Trading Co. v. Commissioner, 95 F.2d 404 (2 Cir., 1938); National Bank of Commerce of Norfolk v. United States, 158 F.Supp. 887 (D.C., 1958). In Halliburton v. Commissioner, 9 Cir., 78 F.2d 265 (1935), the Court held that the term 'property' in the tax law includes 'money', unless otherwise expressly provided by Congress. There is no way of knowing precisely why Congress adopted the new terminology of 'assets' over the old 'properties', but the effect was certainly not to narrow the scope of the phrase. Therefore, were the Court to conclude, and it should not, that the building and the land were the only assets which were not transferred to the new company, this would constitute a transfer of only 64.52% Of the assets, which is not 'substantially all of the assets'. It is not necessary to decide where the demarcation line of 'substantially all' may lie, but it should be held that it is certainly somewhere above 64.52%.[4]
 
 
 52
 In appraising the evidence as to whether there was a 'substantial transfer', the respondent seeks to place a value on 'intangibles', which may also be described as 'good will'. This suggestion arises from the nature of Engineers' Business.
 
 
 53
 The record discloses the fact to be that at no time in the operation of either company was 'good will' considered to be an asset, nor was any value placed thereon. Moreover, this Court should be foreclosed from considering this factor in determining the value of the assets transferred. (T.R. Vol. II, pg. 12, line 24 through pg. 13, line 4.)
 
 
 54
 While Congress may be presumed to have exercised its taxing power to the fullest, that presumption does not authorize this Court to supply additional language to the act. Moreover, if we were to disregard the record in this case and assign a 'thin air' value to good will, or intangibles, or whatever name may be applied, even to the extent of $180,000.00, we would still have under 80% Of the assets transferred.
 
 
 55
 It has been suggested that a loan should be treated as a 'transfer of assets' within the meaning of the statute. The two terms are wholly and completely incompatible. A transfer of assets under any interpretation denotes an investment with the attendant risks. A loan carries with it an obligation to repay with a fixed rate of interest. We must take the record as we find it, and in this case the record does not support the defense that there was a transfer of 'substantially all of the assets' as required in order to tax as ordinary income.
 
 
 56
 The Respondent contends that an historical analysis of Congressional action produces the startling conclusion that Congress intended 'substantially all' in Section 354 to mean 50%. This conclusion is reached by inferring that a proposed Section 357 (H.R. 8300), which was never enacted, was incorporated in Section 354. This is unrealistic and untenable. If Congress says 'substantially all', it means just that, and not 50%.
 
 
 57
 It is my opinion, therefore, that substantially all of the assets were not transferred from Inc. to Engineers, and this transaction does not qualify as a corporate reorganization under Section 354 and Section 368(a)(1)(D). Under the circumstances of these cases, it is not necessary to determine whether there was a plan of reorganization or whether an exchange of stock from the old company to the new was made.
 
 
 58
 The Commissioner claims, however, that at any rate Section 368(a)(1)(F) Should apply. That section would define reorganization as: '(A) mere change in identity, form, or place of organization, however effected.'
 
 
 59
 The cases under consideration do not fall within the purview of this section, for, as has been noted, there was more than a 'mere change'. The new company did not do any contracting or engage in joint ventures. There was a new shareholder who did not own stock in Inc., and Engineers did not acquire some of the major assets which Inc. possessed. See: Joseph C. Gallagher, 39 T.C. 144, at 161, 162. Section (F) seems the complement of Section (D) to the extent that finding, as we should, there was not a transfer of substantially all of the assets, we could not than say there was a 'mere change in identity or form'.
 
 
 60
 The Commissioner finally contended that if there was no reorganization under Sections 354 and 368, then the amounts involved were still corporate dividends under Section 301, and were not received in liquidation of a corporation. The specific governs over the general and Sections 331(a)(2) and 346 are directly applicable here.
 
 
 61
 Finally, it seems to me that the majority opinion abrogates the judicial function in the interpretation of 'substantially all' when it judicially approves the interpretation 'espoused by Rev.Rul. 57-518, 1957-2 C.B. 253.' It seems to me that this phase of the majority opinion goes a step beyond judicial legislation. In effect it gives a judicial blessing to the arrogation, by a branch of the Executive Department, of the legislative process. If Congress had intended 'substantially all' to mean what the Internal Revenue Department thinks it means, it would have said so. I would hold that the Tax Court erred and that its finding was contrary to the weight of the evidence. It is my opinion that the transaction involved here was a liquidation under Sections 331(a)(2) and 346 of the Internal Revenue Code of 1954. The amounts received by Petitioners represented distributions in partial liquidation, taxable under Sections 331 and 346, supra, as capital gains, and should be treated as such. It is my opinion that for the reasons stated the decisions of the Tax Court in these cases should be reversed.
 
 
 
 [1]
 That a mechanical result based on pure percentage is not controlling is evidenced by case law
 In Commissioner of Internal Revenue v. First Nat. Bank of Altoona, Pa., 104 F.2d 865 (3rd Cir. 1939), 86% Was held 'substantially all' of the assets. In Western Industries Co. v. Helvering, 65 App.D.C. 205, 82 F.2d 461 (1936), 85.2% Was held not to be.
 Neither Pillar Rock Packing Co. v. Commissioner of Internal Revenue, 90 F.2d 949 (9th Cir. 1937), nor C.T. Inv. Co. v, Commissioner of Internal Revenue, 88 F.2d 582 (8th Cir. 1937), compel a different result. C.T. Inv. Co., supra, is a weak holding at best, for it was an alternative holding and the court noted that the point was not raised or considered before the Tax Courts. Both cases involved a situation where the taxpayer had to show a 'transfer of substantially all' assets in order to avoid tax. Thus a different standard of construction applies than here, where 'capital gain provisions are an exception to the ordinary treatment accorded most income (and must therefore) be strictly construed.' Pridemark, Inc. v, Commissioner of Internal Revenue, 345 F.2d 35, 44 (4th Cir. 1965).
 
 
 [2]
 The business of Incorporated-- consulting engineering-- was a service business and its most valuable asset consisted of its reputation and the pool of experienced employees which passed intact to Engineers. This asset carried no balance sheet value but plainly constituted a real item of considerable value to Incorporated. Merely because no precise value may be ascribed to this intangible does not, in our estimation, preclude it from a consideration as an asset. Where a business is largely service oriented, as here, this item may well be the single most valuable asset. It is no answer that the employees could resign, as the taxpayers argue. Common experience shows that employees seldom resign en masse. Indeed one of the most fertile areas of controversy today when there is a proposal of merger or other change in business is job loss and tenure 'rights' of employees. The finding by the Tax Court is supported by the testimony of Hatteberg, quoted in taxpayer's brief at page 52, and no reason is suggested why this finding should be disregarded
 
 
 [3]
 Petitioners, John G. Moffatt, Frank E. Nichol and George G. Murray, were the sole stockholders of Moffatt and Nichol, Inc. Inc. was organized in 1947, and its primary business was the practice of consulting engineering; it was also licensed, however, as a building contractor and engaged in some large-scale speculative joint ventures in that endeavor
 On July 22, 1957, Moffatt and Nichol, Engineers, was incorporated. Messrs. Moffatt, Nichol and Murray became officers in the new company, while retaining the same officer positions in Inc. There was one new stockholder, W. J. Bobisch, who purchased ten per cent of the stock in the new company. The new company's activities were restricted to consulting engineering work, thus avoiding the inherent risk involved in speculative joint ventures. The old company, Inc., continued negotiations for joint venture operations as it had in the past. Inc. retained all of its existing engineering contracts, but arranged for the remaining work to be performed by Engineers as its agent. There is disagreement as to the purpose of the organization of Engineers. The Commissioner contended, and the majority opinion upholds that contention, that it was a part of an over-all plan to reorganize Inc. The Petitioners, on the other hand, contended that there was no intent to reorganize, for the new corporation was formed in order that certain key employees, including Bobisch, could invest in a company which did not engage in construction or joint ventures.
 Until December 23, 1958, both corporations carried on operations. Most of Inc.'s activity involved speculation on certain joint ventures and the purchase of land for a new building. On December 23, 1958, Inc. adopted a resolution to dissolve. The subjective reason for this dissolution is, of course, in dispute. The Commissioner contends that it was merely another step in a planned reorganization. The petitioners claim that the large losses being sustained by Engineers coupled with the passage by Congress on August 28, 1958, of Internal Revenue Code 1371-1377, triggered the decision. The petitioners would thus have assets to invest in the new corporation, and upon electing to be taxed as a partnership, they could deduct the losses attributable to Engineers on their individual returns.
 There are three requirements which must be met for a transaction to qualify as a corporation reorganization under Sections 354 and 368(a)(1)(D):
 (1) The corporation to which assets were transferred must acquire 'substantially all of the assets' of the transferor corporation.
 (2) There must be a plan of reorganization.
 (3) The stockholders must exchange stock in the old company for stock in the new.
 The contention of the Commissioner that there was a planned reorganization is apparently based upon two circumstances: First a new accounting firm was employed by Inc. in April of 1957 to examine the records of Inc. as of December 31, 1956 (T.R. Vol. II, p. 26.) One on the partners of the firm, a Mr. Henry Howard, attended a conference with Inc.'s counsel, a Mr. Kennedy, at which several subjects were discussed, including the tax problems of Inc. At the request of Mr Kennedy, Mr. Howard prepared a memorandum for Mr. Kennedy, setting forth a number of recommendations. (Exhibit No. MM.) The record does not disclose that the contents of the memorandum were communicated to the principals or anyone other than Mr. Kennedy. To the contrary, there is testimony that the contents of the memorandum were not communicated to the principals of Inc. or Engineers by anyone. The record does not disclose any action by the Board of Directors of either Inc. or Engineers upon the contents of the memorandum. Second, the dissolution and liquidation of Inc. in December, 1958, over a year and a half after submission of the memorandum, and subsequent to the passage by Congress in August of 1958 of IRC 1371-1377; some of the activities of Inc. in December, 1958, and subsequently, had been suggested in the memorandum of May, 1957, from Mr. Howard to Mr. Kennedy. The lapse of time, the activities of the parties, the economic conditions as they affected the two corporations, all as disclosed in the record, seem to dispel the idea of a 'plan of reorganization'.
 
 
 [4]
 For a discussion of the meaning of 'substantially all' see Dudderar v. Commissioner, 44 T.C. 632, where it was held that the words 'substantially all' as used in Section 264(b)(1) must be given their ordinary meaning of all but a small negligible amount