**Frank W. and Lucile SHARP, Plaintiffs,**
**v.**
**UNITED STATES of America,**
**Defendant.**

Civ. A. No. 65-H-496.

United States District Court
S. D. Texas,
Houston Division.

Oct. 19, 1966.

Chamberlain & Hrdlicka, Harold A. Chamberlain and George A. Hrdlicka, Houston, Tex., and Will Wilson, Austin, Tex., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Tax Division, Richard C. Pugh, Acting Asst. Atty. Gen., and Hubert M. Doster, Attorney, Tax Division, Department of Justice, Washington, D. C., Robert L. Waters, Robert L. Trimble, and Robert I. White, Attorneys, Tax Division, Fort Worth, Tex., and Morton L. Susman, U. S. Atty., and John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

GARZA, District Judge.

This is an action by Frank W. and Lucile Sharp for the recovery of additional federal income taxes and interest assessed against the Plaintiffs for the year 1959 in the sum of $67,902.31. Plain-

tiffs paid the assessment and timely filed a claim for refund. The claim for refund was disallowed and this action was then filed.

Frank W. Sharp will hereinafter be referred to as "Plaintiff" or "Taxpayer", since his wife is a party only because a joint return was filed.

Two separate and distinct issues are involved, one being whether the amount received by Plaintiff from a corporation in which he owned a fifty per cent stock interest was the result of a liquidation producing capital gains, or a reorganization producing ordinary income; and the second being whether Plaintiff realized taxable gain on the disposition of certain water district bonds in which Plaintiff contends he owned no interest.

Plaintiff has filed his motion for summary judgment on both issues, and Defendant, United States of America, has filed its motion for partial summary judgment, seeking judgment in its favor on the first issue only, contending that material issues of fact exist as to the question of the bonds.

The parties have dealt separately with each of the questions presented by their motions, and the Court will do likewise.

## I.

## LIQUIDATION VERSUS REORGANIZATION

The parties agree that the facts necessary to determine this issue are established by the pleadings, requests for admissions and answers thereto, the stipulation of facts, exhibits, and depositions.

During 1954, Plaintiff-Taxpayer acquired an interest in approximately 3925 acres of land known as the Westmoreland property. Shortly thereafter he conveyed approximately 297 acres of this land to Sharpstown Development Company (hereinafter referred to as "Development"), a corporation organized in 1954, in which Plaintiff owned a fifty per cent stock interest. The balance of approximately 3628 acres was conveyed to a second corporation known as Sharpstown Investment Company (hereinafter referred to as "Investment"), which was organized in 1954 and in which Plaintiff also owned a fifty per cent stock interest. The remaining common stock of both Development and Investment was held in identical proportions by various members of the Farnsworth family and the Chambers family. The 297 acres conveyed to Development was developed as Section One of the Sharpstown Subdivision. Of the land acquired by Investment, 335.3 acres were sold to Development during the fiscal year ending September 30, 1956, and was thereafter known as Section Two of Sharpstown Subdivision. No other real property was sold by Investment to Development during the existence of those corporations. With minor exceptions, all real property sold by Investment throughout its existence was from the property referred to above as the Westmoreland property. Also with minor exceptions, all lots sold by Development throughout its existence were lots located within Sections One and Two of Sharpstown Subdivision.

In the early part of 1958 the Farnsworth and Chambers families encountered outside financial difficulties and wanted to get out of the corporations, which were in severe financial straits. The shareholders contributed their Investment stock to Development on February 27, 1958. It was also apparent that much of the land owned by Investment would have to be sold in order to meet the obligations of the corporations. On March 24, 1958, Investment sold to the Plaintiff for a recited consideration of $500.00 an option to purchase 2376.82 acres of the Westmoreland property for $8,100,000.00. The option ran from November 1, 1958, through March 24, 1960.

Through the Plaintiff's efforts, buyers were found and on April 11, 1958, Investment sold the same 2376.82 acres of the Westmoreland property covered by Plaintiff's option, to Messrs. Smith and Neuhaus for a total purchase price of $5,000,000.00, subject to the option. During April, 1958, Investment sold substantially all of its remaining properties to parties other than Development, the sales totaling 2956.28 acres.

On October 16, 1958, Sharpstown Realty (hereinafter referred to as "Realty") was incorporated with capital of $1,000.00 represented by one thousand shares of common stock with a par value of $1.00 per share. At all times relevant hereto the common stock of Realty was owned one hundred per cent by the Plaintiff and members of his immediate family, and, except for the Plaintiff, no shareholder of Investment or Development owned any of the common stock of Realty.

On November 25, 1958, Plaintiff transferred to Realty the option he had purchased from Investment with respect to all but four tracts which were transferred to Realty on December 14, 1959. Investment was liquidated under State law on July 14, 1959, pursuant to a resolution adopted on June 23, 1959. Its assets and liabilities were transferred to Development, and its common stock was surrendered and canceled. On the same date Development was liquidated under State law pursuant to a resolution adopted on June 19, 1959. Its assets and some of its liabilities were distributed to its shareholders as of that date, except for the sum of $60,000.00 which was retained by Development to pay its remaining liabilities. Thereafter through 1962 all remaining liabilities were paid and the balance of the fund retained was distributed to the shareholders by the end of the calendar year 1962, at which time the common stock of Development was surrendered and canceled. After July 14,

1959, Investment and Development conducted no further business except to complete the distribution of assets in dissolution.

Pursuant to the dissolution agreement, Plaintiff received certain non-cash assets of Development with a net value of $53,918.88 which he sold to Realty for that amount. He also received cash in the amount of $72,628.34.[1]

On July 31, 1959, Plaintiff increased the capital of Realty to $50,000.00, and forty-nine thousand additional shares of common stock were issued with a par value of $1.00 per share.

During the period from November, 1958, through July, 1959, Realty purchased approximately 57 acres of land under the option acquired from Plaintiff, and during the years 1958, 1959 and 1960 Realty exercised the option with respect to all but 65.056 acres of the land covered by the option agreement, paying in total approximately $7,500,000.00 to Messrs. Smith and Neuhaus to acquire the property.

On his federal income tax return for the calendar year 1959, Plaintiff reported long-term capital gain of $76,547.23 as a result of the distribution received from Development, and paid the appropriate tax thereon. This sum was computed by subtracting the Plaintiff's basis in the Development stock of $50,000.00 from the total received in liquidation during 1959 of $126,547.23.

Upon audit, the Internal Revenue Service determined that the transaction was

---

[1]. With respect to his 2500 shares of stock in Development, Plaintiff received the assets and assumed the liabilities as follows:

| | | |
|---|---|---|
| Lots, Sharpstown #2 | $ 96,900.00 | |
| Lot, Dunnridge Addition | 25,000.00 | |
| Notes Receivable | 43,307.52 | |
| Accounts Receivable | 284,588.22 | |
| Interest Receivable | 448.65 | |
| Prepaid Insurance | 1,314.50 | |
| Total Non-Cash Assets Received | | $451,558.89 |
| Liabilities Assumed | | 397,640.01 |
| Net, Non-Cash Assets Received | | $ 53,918.88 |
| Cash Received | | 72,628.34 |
| Total Net Assets | | $126,547.23 |

in substance a reorganization and that Plaintiff realized $118,834.68 of ordinary dividend income as a result of the dissolution distribution.

The Plaintiff contends that the cash and non-cash assets distributed to him by Development were received in complete liquidation of the corporation, and that his gain was properly reported as capital gain pursuant to § 331 of the Internal Revenue Code of 1954 (26 U.S.C. § 331).[2]

Defendant argues that beginning with the transfer of the option, the foregoing transactions constituted a series of interrelated steps pursuant to a plan of reorganization under § 368(a) (1) (D) of the 1954 Code (26 U.S.C. § 368(a) (1) (D)).[3]

■ Defendant urges that there was in fact and in substance no complete liquidation of Development, but merely a means of conveying the earnings and profits of substantially unchanged and continuing business operations for the Taxpayer. This would require that the distribution to him be taxed as a dividend pursuant to § 356, the so-called "boot" section, which provides that when a taxpayer as part of a reorganization receives not only stock, but liquid assets or cash to boot, that boot shall be taxed as a dividend to the extent of the earnings and profits of the distributing corporation.

■ A type "D" reorganization requires that there be a plan of reorganization, that the corporation to which assets were transferred must acquire substantially all of the assets of the transferor corporation, and the stockholders must exchange stock in the old company for stock in the new. In addition, the transferor, or one or more of its shareholders, must be in control of the transferee corporation. Section 368(c) defines "control" as the ownership of at least eighty per cent of the voting stock and at least eighty per cent of all other classes of stock.

It is the Government's position that all of these requirements were met here, in that pursuant to a plan by the Taxpayer to continue his business operations "substantially all of the assets" of Development were transferred through the Taxpayer to Realty, and an exchange of stock was unnecessary since the Taxpayer and his immediate family already owned one hundred per cent of the new company. Of course the "control" requirement was admittedly met and is not in issue.

2. § 331. Gain or loss to shareholders in corporate liquidations.
  (a) General rule.—
    (1) Complete liquidations.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

3. § 368. Definitions relating to corporate reorganizations.
  (a) Reorganization.—
    (1) In general.—For purposes of parts I and II and this part, the term "reorganization" means—
      *    *    *    *    *

  (D) A transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;
    *    *    *    *    *

§ 354. Exchanges of stock and securities in certain reorganizations.
  (a) General rule.—
    (1) In general.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
    *    *    *    *    *

  (b) Exception.—
    (1) In general.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless—
  (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets;

■ This Court cannot agree that a plan of reorganization existed under the facts presented here, or that substantially all of the assets of Development were acquired by Realty. Development was liquidated for valid and pressing business reasons, none of which had a tax avoidance purpose. The business of Development was to buy land held by Investment, develop it into subdivisions, and sell lots. Investment effected a bona fide sale to third parties in an arms-length transaction in April, 1958, of the great majority of the land held, and it was liquidated into Development on July 14, 1959. When Development was liquidated on the same date, the only assets it had to distribute were cash and certain non-cash assets which constituted the remnants of the corporations. It business operations ended at that time, and the only circumstance that could form a basis for the Government's contention that they continued under a different corporate shell was the fact that Realty had an option to purchase the acreage which had been sold to Smith and Neuhaus, a small part of which had already been exercised. It is the acquisition of this option by the Taxpayer that gives rise to the Government's apparent view that he planned all along to continue the development of the Sharpstown area without interruption, and did so. The undisputed facts, however, do not bear this out.

In the first place, the sale to Smith and Neuhaus of 2376.82 acres for $5,000,000.00 was not a sham or mere paper transaction. They made a profit of approximately $2,500,000.00 when Realty purchased most of the property for some $7,500,000.00. The option was exercised by purchasing various tracts from December, 1958, through March, 1960, but all purchases except those for 57.866 acres were made in February and March, 1960.

It is obvious that up until the time that Development was liquidated, the Taxpayer had hopes of being able to obtain commitments and financing for a large regional shopping center on the land involved here, and his negotiations with Federated Department Stores, Inc., in attempting to obtain their commitment to build a Foley's store in Sharpstown apparently began in late 1958. They were eventually succeessful, as was the acquisition of large-scale financing which allowed the project to be initiated. Additional factors involved were the annexation of the area by the City of Houston and the completion of the Southwest Freeway near which the shopping center is now located. None of the parties involved in these transactions, with the possible exception of the Taxpayer, could foresee the successes which were to follow, at the time of Development's liquidation. Nevertheless, his hopes of being able to purchase the land at some future date were based on too many uncertainties to amount to a plan of reorganization. Certainly, the other stockholders owning fifty per cent of Development had no such plan or interest in a plan, and the accountants and attorneys involved never thought about it one way or the other.

The history and purpose of § 368(a) (1) (D), as qualified by § 354, is discussed in Pridemark, Inc. v. C. I. R., 345 F.2d 35, 4 Cir. 1965, which rejected the Government's reorganization theory because the liquidated business was not resumed by the new corporation as a continuation of a going concern, even though the new company did resume the same type business before the old corporation was finally liquidated.

The tax treatment of distributions in liquidation of a corporation provided by § 331(a) (1) was utilized by taxpayers to withdraw corporate profits at capital gains rates without interrupting the corporation's business, before the practice was attacked by labeling such a transaction a reorganization and taxing the "boot" at ordinary income rates.

The Fifth Circuit Court of Appeals recently discussed the type "D" reorganization, as well as type "F", § 368(a) (1) (F), which defines a reorganization as "a mere change in identity, form, or place of organization, however effected", in Davant et al. v. C. I. R., 366 F.2d 874, August 22, 1966.

The court there determined that a reorganization had occurred under both § 368(a) (1) (D) and (F), where identical owners transferred the operating assets of one corporation which was liquidated, to an existing corporate shell by way of a purported sale, and received a distribution of cash. The court quotes from United States v. General Geophysical Co., 296 F.2d 86, 5 Cir. 1961, regarding the duty to disregard the form of a transaction and look to the substance or reality thereof:

"The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences.

\* \* \* \* \* \*

"Each case must be decided on its own merits by examining the form and substance of the transactions and the purpose of the relevant tax provisions to determine whether recognition of the form of the transaction would defeat the statutory purpose."

■ The court further points out that the statutory requirement that stock or securities of the transferee corporation be passed to the taxpayers need not be taken literally. See, also, C. I. R. v. Morgan, 288 F.2d 676, 3 Cir. 1966.

■ It is also true that a mechanical result based on pure percentage of assets transferred from the old corporation to the new is not controlling. Moffatt v. C. I. R., 363 F.2d 262, 9 Cir. 1966.

■ However, the sale to Realty of non-cash assets worth $53,918.00, which any of the stockholders could have received in the liquidation of Development had they not preferred cash, cannot meet the "substantially all" test, however it is viewed. Book Production Industries, Inc. v. C. I. R., 24 T.C.M. 339 (1965).

The above cases, as well as the others cited by the parties, point up the fact that the transactions involved here simply do not fit a theory of reorganization as contemplated by the Internal Revenue Code.

The distribution from Development, received by the Taxpayer, was properly reported as long-term capital gain pursuant to a valid liquidation, and should receive the tax treatment provided by § 331.

Therefore, Plaintiff's motion for summary judgment on the first issue will be granted, and Defendant's motion for partial summary judgment on the first issue will be denied.

## II.

## BOND ISSUE

During September, 1956, the Harris County Water Control and Improvement District No. 51 sold nine hundred, $1,000.00 denomination, bearer bonds to Wiley Caldwell, Trustee, for a principal purchase price of $810,000.00 plus accrued interest of $6,187.50. This sale was arranged by the Plaintiff and by Dunbar Chambers whose engineering company was owed a substantial balance for the construction of water and sewage facilities under its contract with the Water District. The company, Farnsworth & Chambers Engineering Company, was then paid partially from the proceeds of the bonds and the balance by the acceptance of another forty-five bonds.

The purchase price of the bonds was financed through the Bank of the Southwest by a loan in the amount of $916,187.50 made to the Trustee and secured by a pledge of the bonds as collateral and by the signatures of Plaintiff and Chambers as co-sureties.

One George Kesseler, who was then a city councilman for the City of Houston, had been contacted by the Plaintiff about the purchase of these bonds at ninety per cent of their par value, and told that he (Kesseler) could make a profit on such a transaction since the bonds would increase in value to par when the Water District was annexed by the City of Houston and its obligations assumed by the City.

On September 25, 1956, the note was signed by the Trustee, guaranteed by the Plaintiff and Chambers, the purchase price of the bonds was paid, and $100,000.00 was deposited into a checking account opened on that date at the Bank of the Southwest in the name of George W. Kesseler, who disbursed this fund for his own use and benefit.

It is the Taxpayer's position that Mr. Kesseler had done numerous favors for him over the years and he participated in this transaction in order to allow Kesseler to make a profit thereon. It is not entirely clear just when the Bank and the Trustee learned that the beneficial ownership of the bonds was allegedly in Kesseler.

On September 2, 1958, after considerable publicity regarding Kesseler's conduct as a city councilman, the City of Houston filed suit in the District Court of Harris County, Texas, seeking to recover any profit Kesseler might have realized from the transaction and to relieve the City of its obligation on the bonds.

While the Bank held the Water District bonds as collateral, the interest payable was credited against the interest due on the note signed by the Trustee, and $2,988.89 was credited against the principal due on the note.

In February, 1959, the Bank sold the bonds to the First National Bank of Dallas, and applied the proceeds in full discharge of the balance remaining due on the note of September 25, 1956, and the expenses of the sale, leaving $18,746.34 which the Bank deposited into the registry of the District Court of Harris County, subject to the final outcome of the suit filed by the City against Kesseler.

On June 29, 1966, pursuant to a settlement agreement between the City and Kesseler, the District Court entered judgment awarding the fund in its registry to the City of Houston and ordered that the City have no further claim against Kesseler.

The Taxpayer contends that he did not own the bonds in question, and any gain on their sale should not result in the imposition of tax upon him. Plaintiff relies upon the State court judgment determining title to the bonds to be in Kesseler, the exhibits, and the deposition testimony that Kesseler owned the bonds.

It is the Government's position that the question of the beneficial ownership of the bonds is factual and should not be disposed of by summary judgment, and that the State court judgment entered pursuant to a settlement agreement is not binding on the Commissioner.

Without unduly prolonging this opinion, suffice it to say that this Court finds the testimony as to the bond transaction far from clear. There are sufficient discrepancies between the deponents to require a trial of the issues involved.

Viewing all inferences to be drawn from the underlying facts in this record in the light most favorable to the Government, Plaintiff has not shown that no genuine issue of fact exists. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Whitaker v. Coleman, 115 F.2d 305, 5 Cir. 1960.

Therefore, the Plaintiff's motion for summary judgment on the second issue will be overruled.

It is ordered, adjudged and decreed that Plaintiff's motion for summary judgment on Issue I be, and the same is hereby granted; and Defendant's motion for partial summary judgment on Issue I be, and the same is hereby overruled; that Plaintiff's motion for summary judgment on Issue II be, and the same is hereby overruled.

Clerk will send copies of this Memorandum and Order to counsel for the parties.