Nichols, Judge,
delivered the opinion of the court :*
Plaintiff, an inter vwos trust, brought this suit to recover federal income taxes in the amount of $6,780.50 and deficiency interest thereon of $542.44, totaling $7,322.94, which it paid for the calendar year 1961.
The taxpayer trust owned certain shares of stock in the K. E. Simon Construction Company (hereinafter sometimes referred to as the “Simon Company” or “KES”). At issue is the proper tax treatment of certain distributions to plaintiff from the Simon Company in 1961, when said corporation was liquidated. The basic question presented is whether the gain realized by plaintiff from the amounts distributed to it in exchange for all of taxpayer’s stock in KES upon the liquidation of that corporation qualifies for capital gain treatment under Sections 331, 1221 and 1222 of the Internal Eevenue Code of 1954, 26 U.S.C. 331, 1221, 1222 (1958). For reasons set forth hereinafter, it is concluded that this question must be answered in the affirmative and that plaintiff is entitled to recover.
*294 The facts are fully set forth in the detailed findings, infra, and they will be summarized only to the extent considered helpful in understanding the reasons for the conclusions and decision reached herein. In 1955, Kenneth R. Simon, father of the beneficiary of the taxpayer trust, formed a proprietorship which principally carried on a carpentry subcontracting business. After about a year, the proprietorship engaged in general contracting to a very limited extent. Mr. Simon’s long-range plan was to become a general contractor in the home-building field and ultimately become a commercial contractor. The main reason he restricted the initial operations of the proprietorship to the carpentry subcontracting business was because it required a very limited amount of capital. The proprietorship quickly developed into a successful enterprise. In December 1957, KES was organized and incorporated in the State of Ohio, with 250 shares of no-par common stock authorized. All of these shares were issued to Mr. Simon. The proprietorship was incorporated for the primary purpose of limiting Simon’s personal liability. On March 1, 1958, KES took over and continued the business of the proprietorship. At that time Simon was the sole owner of KES. Although KES started operations with a minimal capital investment, it almost immediately showed a substantial profit and continued to prosper financially until 1961.
In December 1958, KES was recapitalized in a tax-free reorganization; and Simon exchanged all of his 250 shares of stock in the corporation for 250 shares of Class A voting stock and 250 shares of Class B nonvoting stock. At about the same time, Simon established three separate irrevocable trusts, including plaintiff, one for each of his three minor sons. Mr. Simon’s wife was designated the trustee of these trusts. Between December 1958 and March 1960, Simon made gifts totaling 60 shares of his Class B stock to each trust. As of April 1, 1960, and thereafter, Simon held 250 shares (all) of the Class A stock and 70 shares of the Class B stock, and each trust held 60 shares of the Class B stock.
While KES engaged in general contracting on a minor scale, the primary business of the corporation was carpentry subcontracting in the home-building field. KES was, basi *295 cally, a service-type business. As a carpentry subcontractor, its operations consisted principally of providing and performing carpentry labor, on a bid basis, for general contractors engaged in home building. KES did not furnish construction materials and its main cost of operation was wages for carpenters. The corporation had a relatively small investment in depreciable operating equipment, property, and other assets. Its office was located in Simon’s home. The company books were kept by Mr. William Eobertson, an accountant, who was employed on a part-time basis. Mr. Simon’s wife, Arline A. Simon, trustee of the trust involved herein, maintained the payroll records and performed the routine office work.
The success of KES was completely dependent upon Simon. He ran the business, had the primary responsibility for obtaining new work, estimated jobs, entered into contracts and saw that they were carried out, employed carpenters required to perform the work, and made collections. KES’s almost immediate success was enhanced by, among other things, Simon’s reputation for honesty and fair dealing, quickness in completing work, skill and “know-how,” and the fact that the corporation employed and maintained a key crew of skilled and reliable carpenters and foremen.
About the time Simon organized his proprietorship in 1955, he commenced doing business on a more or less continuing basis with certain individuals who operated a group of related corporations known as the Alvin companies (hereinafter sometimes referred to as “Alvin”) which engaged in building homes in large housing development projects. After the proprietorship was incorporated and began operations as KES, it continued to carry on this business relationship with Alvin. While KES did carpentry subcontracting work for other builders and was required to submit bids in order to obtain Alvin contracts, the corporation’s primary account was Alvin. During the year ended May 31,1960, Alvin accounted for 85.4 percent of KES’s receipts which totaled in excess of $1,311,000.
Sometime in 1958, Alvin indicated to Simon that it would like to have him form a separate corporation for the purpose *296 of doing Alvin work exclusively. It appears Alvin was primarily interested in having the company doing its carpentry subcontracting work enter into a formal arrangement to guarantee repairs and to be free of other business entanglements that might jeopardize its financial ability to discharge guarantee obligations owed to Alvin. Alvin also felt that having a separate corporation doing its work alone would assure that an adequate and dependable carpentry work crew familiar with Alvin’s operations would be available at all times. Simon did not implement Alvin’s proposal to establish a separate corporation and continued to resist the plan until 1960, despite the fact that Alvin pressed the matter from time to time during the intervening period.
Simon also was faced with a problem presented by two of KRS’s principal foremen, Messrs. Edward Zaremba and William Nakoff. They had been employed by Simon since he started in business and were regularly assigned to jobs ICRS did for Alvin. It appears that these valuable employees were discontented because they did not have an interest in a business of their own and first indicated to Simon a desire to have a stock interest in KRS. Although Simon felt that these employees were deserving of an interest in the business and wanted to keep them happy, they did not have sufficient money for investment purposes to purchase more than a small percentage in such a large corporation as KRS. Accordingly, the idea of their buying into the corporation was dropped. However, they continued to voice their desire to have a part of a business of their own which would give them an incentive to build up operations.
In June 1960, Simon, after actively considering the idea of forming another corporation and discussing the matter with prospective shareholders, Alvin’s representatives, and his attorneys, decided to take such action. Thereafter, on July 15, 1960, K.E.B. Construction Company (hereinafter referred to as “KEB”) was organized and the principal business activity actually carried on by the corporation was carpentry subcontracting. The stockholders in the corporation were: Mr. Simon — 80 percent; Mr. Zaremba — 10 percent; Mr. Nakoff — 5 percent; and Mr. Robertson — 5 percent. The total capitalization was $20,000.
*297 It is clear from the evidence that KEB was formed with the original intent and purpose of having it do all the new carpentry subcontracting work required by the Alvin companies exclusively. There were a number of reasons why this action was taken, the principal reasons being, as hereinbefore indicated, that (1) Alvin had requested and pressed over a long period of time that a separate corporation be formed to do Alvin work alone; and (2) Messrs. Zaremba and Nakoff, whom Simon considered deserving and highly valuable employees, were insistent upon having an interest in a business of their own. Considering the evidence as a whole, it is concluded that KEB was organized for some good business reasons and not for the purpose of tax avoidance.
KEB commenced operations in the latter part of July 1960, and at that time limited its business activities to doing new Alvin carpentry subcontracting work which was channeled to it through one of the Alvin companies, Alvin Builders. KBS continued performing unfinished Alvin work in fulfillment of commitments made prior to the time KEB began doing business, and also did carpentry subcontracting work for other builders.
KEB shared KBS’s office quarters maintained in Mr. Simon’s house and used KBS’s office equipment located there. Mr. Bobertson and Mrs. Simon kept the books and payroll, respectively, for both KBS and KEB. KEB initially started with cash only and for a while rented necessary operating equipment from KBS, including two trucks and a few electric saws. Subsequently, KEB purchased these vehicles from KBS, but bought additional operating equipment from other sources. Most of the carpenters who worked for KBS on Alvin projects, including many of the employees and foremen comprising KBS’s key crew, became employees of KEB after it started in business. A number of these workmen were employed by KBS one week and by KEB another. Messrs. Zaremba and Nakoff continued working for KBS for a week or two and thereafter went on KEB’s payroll. Despite the foregoing and similar facts showing that a close relationship existed between KBS and KEB, it appears that these two corporations were operated as separate entities and were known to be such by persons who did business with them.
*298 In the fall of 1960, a few weeks after KEB began operations, Alvin requested KEB to sign agreements covering such things as performance and liability bonds, written repair guarantees, assumption of personal liability, and waiver of lien rights, as conditions to bidding new Alvin work. KEB declined to sign these agreements and participated in negotiations with Alvin’s principals in an effort to resolve their differences. By early December 1960, it became apparent that agreement could not be reached and KEB would not be permitted to submit bids on new Alvin work. Both KEB and KBS continued to work on existing Alvin jobs until they were completed some time in December 1960. In early January 1961, KEB was formally advised to the effect that it would not be given an opportunity to bid upon any new Alvin work. Neither KEB nor KBS performed any work for Alvin subsequent to December 1960. In connection with the foregoing, it appears that as early as 1959, Alvin had been considering doing its own carpentry work because Alvin’s principals felt they could do such work for less money, and a separate corporation was organized to take such action at some future time. However, neither KBS nor KEB was aware of Alvin’s above-mentioned thoughts and plans at the time KEB was organized. It seems clear that Alvin’s secret plan to do its own work was one of the factors which contributed to the failure of Alvin and KEB to continue their business relationship.
When it appeared that there was little likelihood of KEB’s obtaining any more new work from Alvin, KEB decided to stay in business and to seek other carpentry subcontracting work. Mr. Simon, as the principal stockholder in KEB, felt under obligation to Zaremba and Nakoff to cooperate with them in maintaining KEB as a going concern and believed that he would lose their services if he did not do so. As a result of joint efforts of Messrs. Simon, Zaremba and Nakoff, KEB obtained a large carpentry subcontracting contract in December 1960. Thereafter, KEB secured additional contracts from various builders and continued in the carpentry subcontracting field. KBS did not compete with KEB for jobs and sought only contracts that were too large for the *299 latter corporation to handle. Simon devoted most of bis efforts in tbe carpentry subcontracting field to securing work for KEB. KES’s subcontracting business dwindled to tbe point tbat it stopped doing tbis kind of work completely in tbe spring of 1961.
During a period beginning in January 1961, and continuing into June of tbat year, KES submitted an unsuccessful bid on a large carpentry subcontracting contract, actively sought additional general contracting work, actually built two homes on its own land as a general contractor in a joint venture with another general contractor, and made unsuccessful bids on several large public construction projects as a joint venturer with another general contractor. It was necessary for KES to have substantial assets, including cash, in order to bid these projects and be in a financial position to carry out any contracts it might obtain. KES’s receipts from the aforementioned business activities were relatively insignificant compared with its past financial experience. Throughout this generally unproductive period, KES had continuing overhead expenses, including salaries for key and other necessary personnel retained on its payroll, and other operating costs.
In June 1961, Mr. Simon, after discussing the matter of possibly liquidating KES with his attorney and considering various factors and alternatives, decided to take such action. Simon made this decision because KES had failed to obtain contracts for large public construction projects and experienced a substantial decline in its business generally, with the result that the corporation was accruing large losses. The principal reasons why KES’s business declined were because (1) Simon decided to form KEB for the purpose of performing new Alvin work with the consequence that KES obtained no new contracts from this source and did not do any business with Alvin, its primary account, after completing existing projects in December 1960; (2) after sometime in December 1960, KES did not compete with KEB for the kind of carpentry subcontracting business which previously had been the principal source of KES’s receipts; (3) Simon devoted most of his efforts in the carpentry subcontracting field to *300 obtaining contracts for KEB rather than KES; and (4) KES limited its business activities mainly to unsuccessful attempts to obtain large public contracts.
The parties have speculated that Mr. Simon could have liquidated either corporation but as he said and as it would seem, he would have been inhibited to some degree by the fact that one in control of a corporation cannot ride roughshod over minority stockholders.
On July 31, 1961, the Board of Directors of KES formally adopted a resolution calling for the liquidation of the corporation, outlining a plan for the winding up of its affairs, and directing that all of the corporation’s assets and property be distributed to the holders of its outstanding shares “in complete liquidation and cancellation and redemption of all its outstanding shares.” Pursuant to the foregoing, KES, on August 14,1961, was liquidated in accordance with Ohio law. On said date and in November of the same year, all of the corporation’s assets, including over $200,000 in cash and government bonds, were distributed to KES’s shareholders, including plaintiff.
After the liquidation of KES, KEB continued in the carpentry subcontracting business at the same location as before and Mr. Simon devoted his full time to KEB’s affairs. All of the employees who were on KES’s last payroll went to work for KEB the following week, and at this point all of KES’s former key foremen became employees of KEB. A large percentage of the business done by KEB both during the year before and the year after the liquidation of KES was for builders for whom KES had previously done work.
Plaintiff claimed capital gain on the distribution from KES. The Internal Eevenue Service disallowed such treatment, a timely claim for refund was disallowed, and thereafter this suit was timely filed.
Some pertinent statutes and regulatory material are set forth in an appendix and so are not directly quoted in this opinion.
Plaintiff’s position is that the distribution of the KES cash reserve to the KES stockholders is taxable only at capi *301 tal gains rates. It relies on IEC of 1954, § 331, which declares in subsection (a) (1) that amounts distributed in complete liquidation of a corporation shall be treated as full payment in exchange for the stock, and in subsection (b) that § 301 shall not apply to any such, liquidation. Section 301 would make taxable as ordinary income any distribution tbat constituted a dividend. Plaintiff of course would bold that the distribution thus being in liquidation, is not a dividend. Having “exchanged” the stock, plaintiff claims it was a capital asset as defined in § 1221 and the “exchange” is entitled to be treated as a long-term capital gain under § 1222 with, of course, the familiar favorable consequences as to rates.
Defendant’s argument is in the alternative. First, it boldly denies that KES was really liquidated under § 331(a)(1) because, it says, a “liquidation and reincorporation” cannot be treated as a “complete liquidation” unless “either the business of the liquidated corporation is discontinued, or if the business is continued, the controlling shareholders have disassociated themselves from it.” It denies that these conditions were met, and relies on § 301 and § 302(d) to make the distributions, not being in liquidation, taxable at ordinary rates. As a retreat position, it says that the transaction is properly characterized as a “reorganization” of the “D” type as defined in § 368(a) (1) (D). Under § 354 such a “D” reorganization can be accomplished without recognition of gain or loss if certain conditions are met, and defendant says they are met. It follows, if defendant is right so far, that § 331 has no application and §§ 301 and 302(d) will control the tax on the distributions to KES shareholders. Under § 356 property other than stock or securities received in an exchange in a reorganization is taxable as a dividend. Under § 316 a distribution (as here) out of earnings and profits is a dividend.
We think that plaintiff’s position is correct and that defendant’s primary and retreat positions are both erroneous.
There is room for some skepticism whether the IES can tax a distribution in 'a liquidation-reincorporation situation as ordinary income notwithstanding § 331, if it is otherwise applicable, when it does not appear that the transaction is *302 one of the types of reorganization defined in tire statute. In Joseph C. Gallagher, 39 T.C. 144 (1962), at p. 160 the Tax Court said:
[W]e Have been referred to no authority either under the 1954 Code or under the less restrictive language of the preceding revenue acts, in which _ a liquidation-reincorporation has been held to give rise to ordinary income, except where that result could be accomplished by applying the provisions relating to reorganizations.
Acc. C.I.R. v. Berghash, 361 F. 2d 257 (2d Cir. 1966); see Lane, Reincorporation Game, 77 Harv. L. R. 1218, 1230 (1964). Defendant refers us to no contrary case since decided. Instead it relies on three main points, none of which seem conclusive. The first is legislatve history, which is summarized in Pridemark, Inc. v. C.I.R., 345 F. 2d 35, 40 (4th Cir. 1965). In enacting the 1954 Code, the Senate rejected a House provision which would have excluded from capital gains treatment a transaction such as the one before us if tax avoidance was a principal purpose. Discussion in the conference committee report shows that the House receded because the House managers believed that “within the framework of the other provisions” “the possibility of tax avoidance could be dealt with by judicial decision or by regulation.” Here our findings do not reflect that tax avoidance was a purpose in the dissolution and liquidation of KBS, so there is no need to investigate what other provisions the conferees had in mind. Absent tax avoidance, they apparently expected § 331 to be applied according to its terms. The history gives defendant no support on the facts found.
Second, defendant refers to Treasury Begulations on Income Tax (1954 Code) §§ 1.331-1 (c) and 1.301-1 (1), set forth in the appendix. They do not seem to command the argued result with any clarity or precision. See Lane, supra, at p. 1227.
Third, defendant quotes statements in Pridemark, supra, at p. 41, and in Davant v. C.I.R., 366 F. 2d 874, 882-83 (5th Cir. 1966), cert. denied 386 U.S. 1022 (1967). In Pridemark the court held that the old corporation there involved was completely liquidated and its business not transferred to the *303 new. We discuss tbe facts in that case infra. In Davant the court held that § 331 did not cover a merely formal liquidation accompanied by transfer of the business to 'a new company. But it deemed it had to consider the application of the reorganization provision, § 368, in order to discover the tax treatment of the distributions properly applicable. It said at p. 879:
In order to effectuate the intent of Congress the dividend, liquidation, redemption and reorganization sections of the Code must be examined and viewed as a functional whole.
The question of law the defendant seeks to raise need not be answered here, however, because the facts the question requires us to postulate are not the facts of this case.
Defendant assumes and wishes us to assume that the business of the liquidated corporation was not discontinued. In fact, as the record shows, it was discontinued.
On the start of KEB, on or about July 21, 1960, some minor physical assets were transferred to it, and more importantly, there was a transfer of business. Mr. Simon sought to phase KBS out of the Alvin connection, taking no new subcontracts, and substitute KEB. Later, after Alvin had ceased to use either company, KBS no longer bid on carpentry subcontracting work, so as not to compete with KEB, except when the job was too large for KEB to handle with its small capital. Most of the bids by KBS in 1961 were submitted as a joint venturer on several large construction projects. (Finding 46). Its only receipts from such business related to homes it had built. After January, 1961, receipts of KBS from new carpentry subcontracting business were under $10,000.
It seems, therefore, that the transfer of all carpentry subcontracting business to KEB was substantially complete by the start of 1961. In that year the business of KBS was prime contract construction and home building. That business was unsuccessful and was allowed to go down the drain. There was no thought of transferring it to KEB. The Government now admits that the “plan” of liquidation-reincorporation was not formed until June, 1961. Should we decide to adopt *304 the Government’s legal theory, surely we would be required to consider the business of the two corporations at the time the plan was formed, and ascertain to what extent the business of the alleged transferor, as it then was, passed to the transferee. To consider a transfer that long antedated the plan, is to distort the theory — as stated by the defendant itself — before it is properly bom.
In Pridemark the lack of agreement between the date of the alleged transfer and the date of liquidation was decisive in the court’s refusal to apply the defendant’s liquidation-reincorporation theory. The taxpayers decided to liquidate their business, did so, and sold most of its better assets to unrelated parties. They then tried a different line of business without success. Concluding that to be successful they had to operate where they had expertise, they formed a new corporation — the alleged transferee — for that purpose. The Tax Court, 42 T. C. 510 (1964) upheld the IRS’s liquidation-reincorporation theory, but the Court of Appeals reversed, holding that the liquidation was in fact complete, and the alleged transferee was in fact a new business. The real transferee, if any, was the unrelated purchaser. This is of course a different situation from the one at bar, but it does indicate what we should look for in making a sympathetic application of the Government theory. Defendant says that a transaction involving a liquidation and reincorporation cannot be treated as a complete liquidation unless the business of the liquidated corporation is discontinued, 'or the controlling shareholders have disassociated themselves from it. Here, as in Pridemark, the business it had at the time of liquidation was discontinued.
We turn, therefore, to the retreat position that there was anyway a “D” reorganization. Defendant concedes that the various statutory criteria for any § 368 reorganization must all be met. See Commissioner v. Gordon, 391 U.S. 83, 91, 92 (1968). Let one required factor be wanting, and the theory fails. Our commissioner held there was no “plan” of reorganization in effect when KEB was organized. Defendant agrees there must, be a “plan” but says the “plan” may contemplate use of an existing corporation. Therefore the fact, as it concedes, there was no “plan” until June, 1961, it urges *305 not to be fatal to its position. We may agree arguendo that this is so. However, the formation of KEB and the ensuing transfer of most of KRS’s then business to it cannot be considered the first step of the then non-existent “plan.” Commissioner v. Gordon, supra. Lutkins v. United States, 160 Ct. Cl. 648, 312 F. 2d 803, cert. denied 375 U.S. 825, (1963). The “plan” must be given its legal consequences strictly with reference to the situation that KRS and KEB were in when the “plan” was formulated. So considered, the claim that this was a “D” reorganization must fail on another ground.
Section 354(h) (1) (A) and § 368(a) (1) (D), read together as they must be, require that the transferee acquire “substantially all of the assets of the transferor of such 'assets.” Since the balance sheet assets of KRS at the time of its dissolution were primarily cash, which went to the stockholders, the taxpayer trusts, and Mr. Simon personally, and not directly or indirectly to KEB, it might seem to the uninitiated hopeless to satisfy this requirement. The defendant, however, perceives no difficulty at all.
It says, in substance, that the cash distribution may be disregarded because the cash was not an asset required for the further conduct of the business. On the other hand, it urges that KRS did in fact then transfer to KEB an asset or assets, not reflected on the balance sheet, consisting of “good will” derived from and associated with Mr. Simon’s skill and reputation and the “organization” represented by key KRS employees.
The concept, that, in determining what is “substantially all,” distributions to stockholders may be disregarded if not essential to the transferred business, has case support. In Moffatt v. C. I. R., 363 F. 2d 262 (9th Cir.), cert. denied 386 U.S. 1016 (1966), the transferor withheld from the transferee certain lands and plans for development of these lands. The court nevertheless (at p.267) held:
* * *. And it finally wound up with all the assets that were necessary or appropriate to the conduct of the business. There remained in the hands of the stockholders only certain nonoperating assets that were not required in the business, * * *
*306 and at p. 268:
* * *. We would ignore the real character and substance of a transaction to hold in this case, as the petitioners urge, that the retention of a substantial portion of the company’s dollar assets, unnecessary and unused in the business, is sufficient to defeat the operation of Section 368(a)(1)(D) * * *
The transferor and transferee in Moffatt were corporations in business as consulting engineers, and the Tax Court had made findings indicating that the lands were not essential to that type of business. To the same effect are James Armour, Inc., 43 T.C. 295 (1964) ; and Ralph C. Wilson, 46 T.C. 334 (1966). The disregard of substantial quantities of “boot” distributed to stockholders is a feature of other cases, e.g. Reef Corp. v. C.I.R., 368 F. 2d 125 (5th Cir. 1966), cert. denied 386 U.S. 1018, (1967) ; Babcock v. Phillips, 372 F. 2d 240 (10th Cir.), cert. denied 387 U.S. 918 (1967) ; Davant, supra. Some may view this as “to supply additional language fo the Act.” See dissent in Moffatt, supra, at p. 270. There may appear to be a stark contrast between the exact compliance with § 368 required when a taxpayer, for his advantage, claims that a reorganization has occurred (Gordon, supra) and the non-literal interpretation overtly indulged in when the IRS asserts a reorganization against the taxpayer’s anguished protest. Davant, supra, at p. 884; Babcock, supra, at p. 244. A comment in Journal of Taxation, July, 1968, p. 2 calls attention to possible embarrassment of the IRS in future if it persists in riding the reorganization horse in such divergent directions. The Tax Court has stated that for its part at least:
Our determination of the substantive question [reorganization] is not controlled by whether it is more advantageous tax-wise to have a reorganization or not.
Roy G. Andersen, 23 T. C. M. 589, 592 (1964), aff’d. per curiam, 341 F. 2d 584 (9th Cir. 1965).
In American Potash & Chemical Corp. v. United States, ante, at 174, we cited Gordon, supra, to hold the IRS to a showing “with some precision” of all the elements of its claim that a “C” reorganization had occurred.
*307 Lane, cit. supra, at p. 1249 and ff. calls attention to the possible use of the “substantially all” requirement for tax avoidance, and urges various techniques by which courts may satisfy themselves that “substantially all” of a transferor’s assets have passed to a transferee although to an unsophisticated eye it would appear that significant portions had not done so. No case has been found, however, where the “substantially all” requirement is held complied with although no assets at all are so transferred in fact.
The difficulty for defendant is, again, that the facts do not provide a basis for applying its view of the law. The cash or “boot” distributed to the stockholders of KRS may not have been essential to KEB, presumably was not, as defendant says. But it, or at least a substantial part of it, was essential to KRS, so long as it bid on its chosen business. The findings show that without this liquid capital or part of it KRS would have been -unable to bid for the kind of business it did bid for. A company, such as KRS, without such capital, could compete only for the carpentry subcontracting business, and not all even of that. It is the “assets of the transferor” that § 354(b) (1) (A) deals with, and if this really means only assets essential to the conduct of the transferor’s business, the cash reserves of KRS or some of them were in that category.
As regards the transfer of non-balance sheet assets, Moffatt, supra, supports the view that these may, in case of a| service corporation, be deemed transferred if a business is § transferred, and may indeed constitute “substantially all” , the transferor’s assets. We need not join the dissent in Moffatt I in calling this a “thin air” value. We have recently held in a !! different statutory context that the loyal adhesion of an employee to a corporation is an asset substantial enough that | the transfer of property to obtain it is an exchange, not a gift. Tasty Baking Co. v. United States, 184 Ct. Cl. 56, 393 F. 2d 992 (1968).
We have already indicated that we think in substance a going business was transferred from KRS to KEB before the close of calendar 1960. Following the Moffatt technique, we may say that “assets” were transferred, too. After this *308 KEB had some of the former “assets” of KES, some of its “good will”, some of its “going concern value”, some of the adhesion of its employees, including Mr. Simon. So far as appears, Mr. Simon in particular no longer devoted all of his time to KES, but devoted as much to KEB as was necessary to manage its modest capital and business. KES retained some of these “assets”, inasmuch as it was not liquidated at that time but embarked in a new “service” business to which such “assets” were the breath of life.
This partial transfer of assets is not for consideration here because it occurred before the “plan” was conceived and was not in fulfillment of the “plan”.
After surrendering the bulk of its carpentry subcontracting business to KEB, KES was not successful. In 1961 it lost money. It follows inevitably that whatever non-balance sheet “assets” it had must have steadily shrunk in value. E.g., the adhesion of an employee looks more like a liability than an asset if the employee’s salary consistently exceeds the revenue his efforts may generate.
i The assets, including non-balance sheet “assets” of KES f at the time of the conception of the “plan” are those we must | look at to determine if “substantially all” of them were transferred to KEB. The cash, some of it essential to the business, we know went elsewhere. The major non-balance sheet “assets” would appear to have been allowed to go down the drain with the business, so far as they had not done so already. It is contrary to the nature of the “assets” we are discussing, to suppose they could go one way and the business another. They are inseparable. If the business was truly liquidated, as we have held it was, these “assets” disappeared. The fact that the trusts had no interest in KEB would also suggest that the “assets” of KES, not on the books, had scant value, so whether they were transferred to KEB or lost, was of little importance. If they had been of value their gratuitous transfer to KEB would have been a breach of trust. Furthermore, KEB continued to operate at a loss for a year after gratuitously receiving the so-called “assets”.
If KEB had in any way held itself out as willing or able to handle the former prime contracting and home building *309 business of KES, there might be more question. So far as appears, however, it represented itself to customers after the liquidation as just what it was before, a carpentry subcontractor. So far as appears, its stock had no added value after that liquidation.
The defendant’s analysis leads to a different result than ours, simply because it does not face up to the consequences of its concession that the “plan” did not exist before the decision to liquidate, June, 1961. As a result, it fails to distinguish between transfers of non-balance sheet “assets” that took place before formulation of the “plan” and after. If our analysis is correct, practically all such transfers were before. The defendant’s statement at p. 35 of its brief plainly reflects its understanding, which we share, that the only significant “transfers” for § 368 are at the time of liquidation.
What would appear to nail this matter down is that our commissioner has found (Finding 61) that none of the assets of KES were then sold or transferred to KEB. Defendant has not objected to that finding. The parties have stipulated (E 464) that all of the assets of KES were distributed to stockholders in exchange for all its outstanding shares. (Emphasis supplied.)
Since some important part, at least, of the money in the ICES treasury was essential to the conduct of the KES business, but none of it went to KEB, and since the “plan” is not shown to have effected any substantial transfer of other assets to KEB, but any such transfer that took place was before the “plan” was heard of, it follows that the liquida-^ tion-reincorporation here involved does not meet the statutory criterion of a “D” reorganization, that substantially all the transferor’s assets must go to the transferee. It is needless,"in view of this, to consider whether all the other criteria were met.
It further follows that both grounds for taking the case out of the literally applicable liquidation provision, § 331, having failed, the KES corporation was liquidated under that section, and the capital gains rate is applicable to the liquidation distributions to stockholders in exchange for their stock.
*310 Tbe court concludes as a matter of law that the plaintiff is entitled to recover and judgment is therefore entered to that effect. The amount of recovery is reserved for further proceedings under Eule 47(c).

 This case was referred to Trial Commissioner Eranklin M. Stone who submitted a proposed opinion, findings of fact, and a recommended conclusion of law, pursuant to tbe order of reference and Rule 57(a). We acknowledge great assistance from tbe proposed opinion but we reach tbe same result by a different route. We agree with the conclusion of law and adopt it as our own. We adopt tbe findings of fact with minor revisions.