Walter R. and Nell **MITCHELL**
v.
The **UNITED STATES.**

Philip and Audrey G. **REED**
v.
The **UNITED STATES.**

John A. **GILLIN**
v.
The **UNITED STATES.**
Alexander E. and Lorene E. **McKAY**
v.
The **UNITED STATES.**

Nos. 19–69, 23–69, 24–69 and 25–69.

United States Court of Claims.

Dec. 10, 1971.

See also, Ct.Cl., 423 F.2d 309.

Vester T. Hughes, Jr., attorney of record, for plaintiffs. William D. Jordan, Dallas, Tex., of counsel.

Michael H. Singer, Washington, D. C., with whom was Acting Asst. Atty. Gen., Fred B. Ugast, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on August 31, 1971. Defendant filed a notice of intention to except to the commissioner's report which was subsequently withdrawn. On November 3, 1971, the parties filed a joint motion for judgment requesting that the court adopt the trial commissioner's findings of fact, opinion and recommended conclusion of law as the basis for its judgment in this case and the case has been submitted to the court on this joint motion without oral argument.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiffs are entitled to recover, together with interest as provided by law, and judgment is entered for plaintiffs with the amounts of the recoveries to be determined pursuant to Rule 131(c).

## OPINION OF COMMISSIONER

WHITE, Commissioner:

These cases, which were consolidated for trial purposes because they involve common questions of fact and law, are suits for income tax refunds.

It is my opinion that the plaintiffs are entitled to recover.

The plaintiffs John A. Gillin, Audrey G. Reed, Alexander E. McKay, and Walter R. Mitchell were the sole shareholders in a Liberian corporation called Namco International, Inc. ("Namco"). Namco was incorporated on September 13, 1957, and was dissolved on December 18, 1962. In connection with the dissolution of the corporation, all of Namco's outstanding stock certificates were returned to Namco's secretary, were marked "Cancelled," and were reinserted in the stock certificate book. The property, other than cash, owned by Namco at the time was sold for cash, and all the cash was then distributed to Namco's shareholders in consideration for the cancellation of their stock in Namco. Distributions of the cash were made in 1962, 1963, and 1965.

Mr. Gillin, who had owned 975 shares of Namco's stock at the time of dissolution, received distributions totaling $245,071.53; Mrs. Reed, who had owned 542 shares of Namco's stock, received distributions totaling $136,234.63; Mr. McKay, who had owned 296 shares of Namco's stock, received distributions totaling $74,401.20; and Mr. Mitchell, who had owned 187 shares of Namco's stock, received distributions totaling $47,003.46.

In their income tax returns for the pertinent years, the plaintiffs reported the amounts of the Namco distributions, less their bases in the stock of Namco, as long-term capital gains (they had held their shares of stock in Namco for more than 6 months). However, when the Internal Revenue Service audited the plaintiffs' income tax returns, the IRS determined that the Namco distributions (in so far as they represented earnings and profits) constituted dividends and should be treated as ordinary income. Accordingly, the Internal Revenue Service assessed income tax deficiencies against the plaintiffs, and the plaintiffs paid such deficiencies, together with interest. After timely claims for refunds had been filed by the plaintiffs and rejected by the Internal Revenue Service, the present court actions were instituted.

Section 301 of the Internal Revenue Code of 1954 (26 U.S.C. § 301), provides in pertinent part that a distribution of property (which includes money) made

---

* The concurring opinion of LARAMORE, Judge, follows the opinion of the trial commissioner which has been adopted by the court.

by a corporation to a shareholder out of earnings and profits shall constitute a dividend and shall be included in gross income for income tax purposes. On the other hand, Section 331 of the 1954 Code (26 U.S.C. § 331) declares in part that "Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock," and that "Section 301 * * * shall not apply to any distribution of property * * * in * * * complete liquidation."

It is the plaintiffs' contention in the present litigation that the Namco distributions of 1962, 1963, and 1965 to the shareholders of that corporation were "in complete liquidation" of Namco and, therefore, that Section 301 of the 1954 Code was not applicable to such distributions. The defendant, however, takes the position that the dissolution of Namco did not result in the complete liquidation of that corporation, but that Namco, in effect, was reorganized into a Liberian corporation known as National McCollum Continental International, Inc. ("McCollum").

Accordingly, it is necessary for the court to decide whether there was a complete liquidation of Namco or, in effect, a reorganization of Namco into McCollum.

This court and other courts have had occasion through the years to wrestle with the problem of whether something in the form of a corporate liquidation was actually a complete liquidation or, in effect, a reorganization into a successor corporation. A crucial question in dealing with such a problem is whether the business of the dissolved corporation was discontinued upon its dissolution, or whether, after the dissolution, there was a continuation of the business of the dissolved corporation by a successor corporation. Unless the facts show that the business of the dissolved corporation was subsequently carried on by a successor corporation as the continuation of a going concern, it necessarily follows that there was a complete liquidation—and not a reorganization—of the dissolved

corporation. Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35, 41 (4th Cir. 1965). This has been recognized administratively, because § 1.368–1(b) of the Treasury Regulations on Income Tax (1954 Code) specifically provides in part that " * * * Requisite to a reorganization under the Code * * * [is] a continuity of the business enterprise under the modified corporate form * * *."

Accordingly, a threshold determination must be made in the present case as to whether Namco's business was discontinued upon the dissolution of that corporation, or whether, after the dissolution, Namco's business was carried on by McCollum as the continuation of a going concern.

During its corporate existence, Namco was engaged in the business of conducting geophysical surveys in Libya for the purpose of locating petroleum and other minerals. Namco also performed such a survey in Guatemala during the period January 1958–September 1959. The surveys were conducted pursuant to written contracts with third persons; and the contracts specified the duties of Namco as an independent contractor, the equipment and the personnel to be provided by Namco, and the fees to be received by Namco for the services rendered. For the performance of these contracts during the period January 10, 1958—December 16, 1962, Namco received gross fees that totaled more than $7,400,000.

The geophysical surveys mentioned in the preceding paragraph were performed by groups of men that were called "field parties." The field parties were composed in part of supervisory and high-technology personnel performing functions as party chiefs, supervisors, computers (seismologists), observers, surveyors, and drillers (tool pushers); and they were also composed in part of other personnel performing less technical functions, e. g., shooters (who handled explosives), mechanics, welders, drivers, helpers, cooks, and maintenance personnel. As of June 30, 1960, Namco had a

total of 230 persons in its employ in Libya, and a large majority of these employees were Libyan nationals.

On December 31, 1960, Namco entered into a contract with Delhi Australian Petroleum, Ltd. ("Delhi"), under which Namco was to perform seismograph surveys for Delhi in the Australian states of Queensland and South Australia, commencing on or about March 1, 1961. After signing the contract, Namco shipped some equipment from its operations in Libya to Australia, transferred two employees from Libya and one from the United States to Australia, and attempted to qualify to do business in Australia. However, Namco could not qualify in either Queensland or South Australia because its name conflicted with other registered companies in the two states.

When it was learned on or about February 17, 1961, that Namco could not qualify to do business in Australia because of its name, the board of directors of the corporation discussed the problem of what should be done. Consideration was given to changing the name of Namco, but the directors felt that they could not get it changed in Libya. Furthermore, Namco had spent considerable amounts of money trying to get its name known among oil companies, and it was felt that changing the name, even if it could be done, would result in a big loss.

Because of Namco's failure to qualify in Australia, Messrs. Gillin, McKay, and Mitchell and Mrs. Reed—the owners of Namco—incorporated McCollum in Liberia on March 2, 1961. Messrs. Gillin, McKay, and Mitchell and Mrs. Reed had the same respective percentages of ownership in McCollum as they had in Namco.

After McCollum was incorporated, Namco assigned the Delhi contract, with Delhi's consent, to McCollum. Also, the equipment which Namco had previously shipped to Australia was sold by Namco to McCollum, and the three employees

whom Namco had transferred to Australia were employed by McCollum.

The facts previously referred to concerning the transfer of the Delhi contract, some equipment, and three employees from Namco to McCollum are not significant from the standpoint of determining whether Namco's business was carried on by McCollum after the dissolution of Namco, because there was no thought on the part of the owners of the two corporations at the time of such transfers that Namco would discontinue operations and be dissolved. Only a taking over of Namco's business by McCollum in connection with the planned liquidation of Namco would be significant from the standpoint of the present inquiry (Ross Michael Simon Trust v. United States, 185 Ct.Cl. 291, 304, 402 F.2d 272, 278 (1968)); and, as previously indicated, there was no such plan of liquidation at the time of the transfers previously mentioned.

After McCollum was incorporated, both Namco and McCollum were actively engaged in business, Namco in Libya and McCollum in Australia. In addition to performing the Delhi contract, McCollum entered into numerous contracts with other companies for the performance of geophysical surveys in Australia. For the performance of its contracts, McCollum purchased large amounts of equipment (in addition to the equipment which Namco had shipped from Libya to Australia and which McCollum purchased from Namco after the Delhi contract was assigned to McCollum); and McCollum hired many employees (in addition to hiring the three persons previously mentioned as having been transferred by Namco to Australia at a time when it was supposed that Namco would perform the Delhi contract).

As stated previously, Namco continued operating in Libya while McCollum was operating in Australia. In 1962, however, Namco had only one contract for the performance of geophysical work, and that contract was with its principal client, American Overseas Petroleum,

Ltd. ("American Overseas"). Notwithstanding the decline in its business, Namco expected to continue in business indefinitely. It insured its vehicles effective September 1, 1962, for a 1-year period; it purchased in Dallas and shipped to Tripoli a Roto Lite Printer in August 1962; it attempted in 1962 to secure personnel by placing advertisements in various Texas and Colorado newspapers and in a trade publication; and it transferred employees to Libya in October and November of 1962. In addition, Namco's officers expended substantial amounts of time and money during 1962 in attempting to obtain new business for Namco, both from old clients and prospective clients. For example, Mr. McKay spent almost the entire month of October 1962 in New York City, Rome, Teheran, The Hague, and London, calling on old clients and prospective clients in attempts to obtain new business for Namco. However, the attempts to obtain new business were unsuccessful.

By means of a letter dated November 16, 1962, Namco was notified by American Overseas that Namco's last existing contract was being terminated on or about December 17, 1962.

After the receipt of the termination notice from American Overseas, Namco's board of directors met on November 28, 1962, and resolved, since extensive efforts to secure new business had been unsuccessful, and since the termination of the American Overseas contract would have the effect of terminating Namco's last remaining business, to liquidate Namco. A special meeting of the shareholders was held on December 4, 1962, at which time the directors and officers were instructed to devise and carry out a plan of liquidation of the corporation. Such a plan of dissolution and liquidation was drawn up; and on December 11, 1962, the board of directors resolved that the corporation terminate its business as of the date of the termination of its last contract on or about December 17, 1962, and that the trustees in dissolution convert all of the remaining property to cash and distribute the cash to the shareholders.

The American Overseas contract was terminated by that company on December 17, 1962.

The evidence in the record warrants a finding that if the American Overseas contract had not been terminated, or if Namco had been able to obtain other business in Libya or elsewhere in that part of the world, Namco would not have been dissolved but would have continued to operate.

On December 17, 1962, all of Namco's physical assets—consisting of inventory, shop equipment, portable equipment, office furniture, office supplies, trucks and trailers, and camp equipment—was sold to McCollum for $82,568.52 in cash, which amount represented the depreciated book value and the appraised fair market value of such assets. McCollum did not intend to use the property which it purchased from Namco on December 17, 1962, but intended to sell it as promptly as possible. Namco knew that McCollum was buying such property for resale.

Namco sold its physical assets to McCollum on December 17, 1962, for several reasons. One reason was that Namco desired to dissolve as soon as possible after its business terminated, and selling its property to McCollum was expeditious and aided in accomplishing this purpose. Also, Namco was very concerned about the actions of the Libyans if the equipment were left idle in Namco's name for any great length of time. The Libyans acted quite arbitrarily at times; Namco had always had some trouble from the Libyans in operating there; and such difficulties had been intensifying. It was felt that there was a substantial risk that the Libyans might levy a duty on, and possibly confiscate, the equipment, and that the Libyans also might possibly forfeit a bond in the amount of $84,000 that Namco had furnished. Namco felt that the dangers of arbitrary action, including the possible confiscation of the physical assets, would be less likely if title to the assets were not in Namco's name and if another company were making the ultimate disposition of the assets.

Namco was officially dissolved on December 18, 1962; and, as stated earlier in this opinion, all of Namco's cash was distributed by the trustees in dissolution to Messrs. Gillin, McKay, and Mitchell and Mrs. Reed as the sole shareholders of Namco.

After purchasing Namco's physical assets on December 17, 1962, McCollum hired two former employees of Namco in Libya for the task of disposing of such property. While McCollum was trying to sell the assets purchased from Namco, McCollum inquired of American Overseas (among others) as to whether it desired to purchase some of the equipment. American Overseas thereupon requested McCollum to drill for a small amount of velocity information in Libya. McCollum agreed to perform this work and signed a contract with American Overseas on December 19, 1962, for the work. In performing this contract, McCollum utilized two trucks, equipped with drills, which it had purchased from Namco; and McCollum employed a driller, who had formerly worked for Namco, to perform the job for American Overseas. The work was done in less than a month's time, during the period from December 19, 1962, to January 11, 1963. Gross fees under this contract were about $3,500.

In addition, American Overseas engaged McCollum on January 12, 1963, to provide interpretative services in Libya by two men for a period of not to exceed 6 months. Two former Namco employees were hired by McCollum to perform this work. No equipment was used on the job. Gross fees for this work totaled approximately $10,000.

The work mentioned in the two immediately preceding paragraphs was the only work that McCollum did in Libya (except for the sale of the physical assets formerly owned by Namco). Such work was unsolicited as far as McCollum was concerned; it was undertaken as an accommodation for American Overseas; the proceeds were insignificant in comparison with McCollum's gross earnings in Australia; and no profit was made by McCollum on the two small contracts.

By about May 1963, McCollum had sold all of the equipment which it acquired in Libya from Namco on December 17, 1962, with the exception of some of the spare truck parts. McCollum was unable to dispose of certain of the spare truck parts, and these particular items were finally shipped to Australia. They were all obsolete and shopworn; and it is not known how many, if any, were actually used by McCollum in its Australian operations.

The preceding summary of the pertinent evidence warrants a finding that McCollum did not, after the dissolution of Namco, carry on Namco's business as the continuation of a going concern. Rather, the business that McCollum engaged in after Namco's dissolution was McCollum's own business. McCollum had been conducting large-scale operations in Australia prior to Namco's dissolution, and such operations were continued after Namco's dissolution. Even the two small contracts which McCollum performed in Libya after Namco's dissolution were McCollum's contracts, because they grew out of developments that occurred after Namco's dissolution.

Namco's business was wholly terminated at the time of the dissolution of that corporation. Therefore, it necessarily follows that there was a complete liquidation of Namco, and that Section 301 of the 1954 Code was not applicable to the distribution of Namco's cash to its shareholders in connection with Namco's dissolution.

The conclusion stated in the preceding paragraph makes it unnecessary to consider other questions that would be pertinent if there had been a continuation of Namco's business by McCollum, e. g., whether there was a plan of reorganization in this case (United States v. Arcade Co., 203 F.2d 230, 232 (6th Cir. 1953), cert. denied, 346 U.S. 828, 74 S. Ct. 48, 98 L.Ed. 352 (1953); Treas.Reg. § 1.368-1(c)), and whether the plan of reorganization (if any) met all of the criteria specified for one of the types of reorganization defined in subparagraphs

(A)–(F) of paragraph (1) of subsection (a) of Section 368 of the 1954 Code (Ross Michael Simon Trust v. United States, *supra,* 402 F.2d at p. 279, 185 Ct.Cl. at p. 304). Affirmative answers to both of these questions would be essential to a determination that Namco was reorganized into McCollum.

For the reasons previously stated in this opinion, the plaintiffs are entitled to recover. As the joint trial of the four cases was held on the issue of liability only, the determination of the amounts of the several recoveries must be reserved for further proceedings under Rule 131(c).

. LARAMORE, Judge (concurring):

As initially noted in the Per Curiam portion, this case comes before the court after the parties thereto filed a joint motion for judgment requesting that the court adopt the trial commissioner's findings of fact, opinion and recommended conclusion. It is a puzzle to me why the defendant does not pursue the reorganization argument under 26 U.S. C. § 368(a) (1) (D) (1970) as developed by the James Armour, Inc. case, 43 T.C. 295 (1964), but having not done so, I reluctantly concur with the result arrived at by our commissioner.